## BLACK DIAMOND S. S. CORPORATION v. NATIONAL LABOR RELATIONS BOARD.
### No. 135.

Circuit Court of Appeals, Second Circuit. Feb. 14, 1938.

Hunt, Hill & Betts, of New York City (John W. Crandall, Frank J. Zito, and Allen G. Miller, all of New York City, of counsel), for Black Diamond Steamship Corporation.

Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, both of Washington, D. C., and Laurence A.

Knapp, of Washington, D. C., and Samuel Edes, of Philadelphia, Pa., for National Labor Relations Board.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

On November 26, 1935, the Black Diamond Steamship Corporation (hereafter to be called the Black Diamond) made a contract with U.L.O., a union of licensed officers affiliated with the American Federation of Labor, relating to rates of pay, hours and conditions of employment. The contract took effect on December 1, 1935, and remained in force for one year and, in making it, the U.L.O. acted as the representative of the deck and engine room officers of the Black Diamond. Prior to signing the agreement the U.L.O. had checked the licensed officers of the latter and had found that more than a majority of them were among its members. Before the signing of the agreement Local 33 of M.E.B.A., a union claiming to represent a majority of the engineers of the Black Diamond, had asked the latter to enter into an agreement with it. In April, 1936, some negotiations with reference to making such an agreement occurred which fell through and, on July 2, 1936, the M.E.B.A. Local 33 filed a petition with the Regional Director of the National Labor Relations Board for an investigation and certification of representatives of petitioner's licensed engineers pursuant to section 9(c) of the National Labor Relations Act, 29 U.S.C.A. § 159(c). The U.L.O. was made a party to those proceedings and the Board conducted a hearing in which Black Diamond, U.L.O. and M.E.B.A. were represented. The International Union of Operating Engineers was also allowed to file a brief as amicus curiæ. As a result, on September 24, 1936, the Board rendered a decision that the licensed engineers constituted an appropriate unit for collective bargaining within section 9(b) of the Act, 29 U.S.C.A. § 159(b), but found that it was impossible from the proofs offered to determine which union represented a majority of such engineers without an election which was accordingly ordered to be had among the engineers by secret ballot under the supervision of the Director of the Second Region to determine which of the two unions should represent them. The election having been had, the Board, on December 11, 1936, certified that M.E.B.A. Local 33 was the exclusive bargaining agent for the engineers.

Prior to the decision of the Board as to the election and its certification on December 11, 1936, and about November 10, 1936, the chief engineers of three vessels of the Black Diamond refused to sail their ships on the ground that the personnel of the crews was unsatisfactory. Various labor disputes arose about this time. The first controversy was between the Black Diamond and the rank and file of its unlicensed men who belonged to the Curran wing of an organization known as the International Seamen's Union (hereafter called I.S.U.) comprising only unlicensed seamen. These men, without authority from the officers of their union, went on strike because of sympathy with a strike on the Pacific Coast by the Maritime Federation of the Pacific. They were persuaded to do this through the activities of Joseph Curran. The second controversy was with the men of Local 33 of the M.E.B.A. which contained only engineers. The engineers asserted that they would not sail unless the unlicensed crews accompanying their ships were men competent for their work and asserted that at that time only Curran men, in contradistinction to those still loyal to the International Seamen's Union, were competent and available. The Black Diamond refused to take Curran seamen because it was already under contract with the regular I.S.U., and Brown, the leader of the National M.E.B.A., had approved of taking any men holding regular membership in I.S.U. It was because of this controversy that the three chief engineers we have mentioned refused to sail. They remained on board, however, for a time and kept up steam. Two of these chief engineers with their assistants, making eight chief and assistant engineers, left their ships when they sailed on November 18, and 22, 1936, respectively. The third chief engineer and his three assistants remained on board refusing to sail until November 23 when a strike was called and they left their ship. There was a further labor dispute precipitated by Brown, the leader of the National M.E.B.A., who wrote to the Black Diamond a letter dated November 13, 1936, which was not replied to, demanding collective bargaining with his organization as to wage scales and working conditions of the engineers. As a result of these various controversies the engineers of the

Black Diamond ships were all on strike by November 23, 1936. It was on that date that the National M.E.B.A. ordered all engineers to strike. In January, 1937, the strike was called off and prior to that, on December 31, 1936, a demand was made to reinstate the engineers on strike. The foregoing matters are set forth in order to show the general background of the issues here involved.

In January and February, 1937, Trainer as the representative of M.E.B.A. Local 33, the bargaining agent of the engineers, filed charges with the Regional Director at New York claiming that the Black Diamond had refused to bargain and also had refused to reinstate the striking engineers. The Board thereupon filed its complaint against the Black Diamond, which resulted in a decision sustaining the charges of refusal to bargain and to reinstate the engineers. It apparently was thought that not only the refusal to bargain was an unfair labor practice but that the failure to reinstate was also one because such failure was equivalent to a discharge of persons whose work had ceased as a consequence of a "current labor dispute" and an employment of other engineers discriminated against the first group contrary to section 8(3) of the National Labor Relations Act, 29 U.S.C.A. § 158(3). The Board ordered the Black Diamond to cease and desist from refusing to bargain collectively with M.E.B.A. and from refusing to reinstate and ordered respondent to offer to 35 named engineers "reinstatement in their former positions, without prejudice to their seniority and other rights and privileges, dismissing if necessary engineers employed for the first time since December 14, 1936." It also ordered the respondent to make whole engineers who had been refused reinstatement by payment to them of such sums as they would have earned as wages on the vessel they were employed upon on November 23, 1936, from the date of the first sailing of the vessel after December 31, 1936, to the date of an offer of reinstatement.

■ Applications are now made by the Black Diamond to set aside and by the Board to enforce the foregoing order. There was a finding that the Black Diamond on December 14, 1936, December 31, 1936, January 4, 1937, and January 7, 1937, refused to bargain with M.E.B.A. Local 33 as the certified representative of the engineers. That there was a refusal on the last three dates is not in dispute. The finding of a refusal on December 14 may be important because the engineers entitled to reinstatement and back pay are, in our opinion, limited to those whose positions were filled after December 14, 1936, the time when the first unfair labor practice, i. e., refusing to bargain with a certified representative of the engineers, occurred. The finding of a refusal on that date is justified by the testimony of Trainer, the head of M.E.B.A. Local 33, who said that he requested Hanlon, the vice-president of Black Diamond, to bargain with his organization as the accredited representative of the engineers and that the latter replied: "All of the engineers or most of the engineers are out of the company now. You represent no engineers; we are not going to bargain with you."

The examiner who heard the witnesses made no finding that there was a refusal on December 14 and Hanlon specifically denied the conversation. Moreover, Trainer in a later part of his testimony made statements which might be regarded as inconsistent with his earlier statement as to a demand and refusal to bargain on December 14. But the earlier conversation was not called to his attention when he made the later statements and those statements did not so clearly contradict it that we ought to hold that there was no evidence justifying the Board's finding. This is especially so in view of the fact that the matters under discussion when the later statements were made related to the date of the termination of the strike and not to a request and refusal to bargain.

■ In providing for "dismissing if necessary engineers employed since December 14, 1936," the order of the Board evidently intended to limit reinstatement and back pay to those of the 35 engineers whose former positions were taken by men hired for the first time after that date. So far as there were not places filled by engineers hired afer December 14 no offers to reinstate needed to be made. This is in accord with what was decided in Jeffery-De Witt Insulator Co. v. National Labor Relations Board, 4 Cir., 91 F.2d 134, 136, 112 A.L.R. 948.

■ The dominant purpose of the National Labor Relations Act according to section 1 thereof, 29 U.S.C.A. § 151, is to safeguard the flow of interstate commerce by

protecting the right of employes "to organize and bargain collectively" and by giving workers full freedom of association for the purpose of negotiating the terms and conditions of their employment. The act is not calculated to force adjustments of disputes, and each party to a labor controversy is left to use its own economic strength in all lawful ways to promote its advantage. The method devised by the act to prevent the interruption of the flow of interstate commerce by labor disputes is to insure collective bargaining through untrammeled representation of employees through representatives of their own choice. The employees can only invoke the act to bring this about: (1) By electing their bargaining representatives under supervision of the Board if those who represent them are, as here, found by the Board to be in doubt; (2) by restraining interference with their rights to bargain and by restraining other unfair or discriminatory labor practices; and (3) by obtaining reinstatement with or without back pay of employees who have been subjected to any unfair labor practice.

The act so far as reinstatement is concerned only applies after there has been an unfair labor practice. As we have said in the opinion in National Labor Relations Board v. Remington Rand, Inc., 2 Cir., 94 F.2d 862, to be filed herewith: "the powers granted the Board under section 10(c), 29 U.S.C.A. § 160(c), are only remedial; they are designed to enable it to restore the status quo as nearly as possible, had the wrong not been committed; further it may not go." So long as the bargaining agency was doubtful and the election was being held by order of the Board, the parties were left to their relative economic advantages and were without remedies under the act. After December 14, 1936, to refuse to bargain and to refuse to reinstate those engineers who were entitled to reinstatement were unfair labor practices under section 8(1) (3) and (5) of the act, 29 U.S.C.A. § 158(1, 3, 5).

Under the act men who cease working because of a labor dispute or because of an unfair labor practice retain the status of employees. How long this continues is not made clear. But it is not necessary to decide the point here. All engineers were employees under the act, who had left work in consequence of labor disputes. But, having done so before any unfair labor practice, they were relying, and were only entitled to rely, upon a test of economic strength. They struck at a time when the Board was conducting an election. Since the act expressly leaves the right to strike unaffected, any remedies they had were unaffected by continuing on strike. When, on December 14, 1936, the Black Diamond refused to bargain with the certified bargaining agent of its employees, it violated the act and became subject to such orders of the Board "as will effectuate the policies of this Act [chapter]." Section 10(c), 29 U.S.C.A. § 160(c).

From the date of the respondent's first unfair practice, its ordinary right to select its employees became vulnerable. Accordingly it was proper for the Board to order it to discharge all engineers hired for the first time since December 14, 1936, and to offer reinstatement first to those striking engineers whose former positions were open, and then to the other striking engineers if, for any reason, any man entitled to reinstatement refused to accept it. To those men so reinstated the company must also give back pay. This is the extent of the order.

Counsel for the Black Diamond argue that the order of the Board, as applied to this case, if justified by the act, contravenes the Fifth Amendment of the Constitution, because it requires reinstatement of men who left the company's employ voluntarily and the discharge of those hired to take their places. They say that in the Supreme Court's recent decisions sustaining the Wagner Act, 29 U.S.C.A. §§ 151–166, the persons reinstated had been discharged because of union membership or activities, whereas here the severance of relations was voluntary. But under section 2(3) of the act, 29 U.S.C.A. § 152(3), the striking engineers still remained employees, and to "effectuate the policies of this act [chapter]," section 10 (c), 29 U.S.C.A. § 160(c), no more is done than to maintain the status quo which existed on December 14, 1936, as against unfair labor practices which occurred thereafter. The facts bring the case within the rule established in National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L. R. 1352, and the other Supreme Court decisions.

For the foregoing reasons the petition by the Black Diamond to set aside the or-

der of the Board is denied, and the petition of the Board to enforce its order as we have construed it and within the limits of such construction is granted.