## NATIONAL LABOR RELATIONS BOARD v. NATIONAL CASKET CO., Inc.

### No. 8.

Circuit Court of Appeals, Second Circuit.

Dec. 11, 1939.

---

L. HAND, Circuit Judge, dissenting.

———◆———

Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, and Samuel Edes and Marcel Mallet-Prevost, all of Washington, D. C. (Gerhard P. Van Arkel, of Washington, D. C., of counsel), for petitioner.

Greene & Greene, of New York City (Richard T. Greene, Daniel S. Murphy, and Malcolm C. Law, all of New York City, of counsel), for respondent.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

SWAN, Circuit Judge.

This case is before us on a petition by the National Labor Relations Board for enforcement of an order made by it on June 20, 1936 as amended by its order of April 10, 1939. The respondent is a New York corporation engaged in manufacturing wooden caskets and funeral accessories. A substantial proportion of its. product moves in interstate commerce; it is concededly subject to the jurisdiction of the Board. It has a manufacturing plant and its principal office at Oneida, N. Y. In substance the amended order directs the reinstatement with back pay of one employee who was discharged on July 15, 1935, ten days after the National Labor Relations Act went into effect, 29 U.S.C.A. § 151 et seq., and the "reinstatement" of six former employees who were discharged several months prior to the effective date of the Act, and payment to them of the wages they would have earned, less their "net earnings" from working elsewhere, if the respondent had employed them on the respective dates, or shortly thereafter, when they applied for reemployment after the Act became effective. It also orders the Company to cease and desist from discouraging membership in Casket Makers Union 19559 or in any other manner interfering with its employees in the exercise of their right to self-organization.

Before passing to a consideration of the validity of the order it seems desirable to explain the astonishingly long time that has elapsed between the filing of the charges of unfair labor practices and the presentation of the case in court. Charges on behalf of the discharged men were filed in October 1935 by Casket Makers Union 19559. The Board filed its complaint on November 4, 1935 and appointed a trial examiner who held hearings during that month. On December 16, 1935 the Board ordered the case transferred to and continued before it. Thereafter counsel for the respondent was permitted to file a brief and on June 20, 1936, without any report by the trial examiner who had taken the testimony, the Board made its findings of fact and law and issued its order. In August 1937, a petition for enforcement of this order was filed in this court, but before the case was reached for argument the Board, apparently realizing that its proof was insufficient in certain respects, obtained an order remanding the cause for the taking of further evidence "on the question of the availability of positions or employment in respondent's Oneida, New York, plant during or subsequent to the period of respondent's refusal to reinstate the persons named in the complaint issued by the Board; and for no other purpose." Thereafter a one day hearing was had before another trial examiner in April 1938; he reported to the Board in July 1938; and on April 10, 1939 the Board issued its supplemental findings of fact, conclusions of law and recommendation for modification of its former order, with a request that the order as modified be enforced by this court. No effort was made to bring on the case for argument before the summer recess, and in due course it was reached and heard in October 1939. When a complaint involves the granting of affirmative relief against an employer, it is particularly desirable that the case be prosecuted to conclusion with as much expedition as is reasonably practicable; for any unnecessary delay results in obvious hardship to the employer, since the longer the delay the larger the sum he must pay as wages for work never performed, if the order requires reinstatement of employees with back pay. But the fact that there appears to have been unnecessary delay on the part of the Board in the case at bar has not been urged by the respondent as a factor to be considered by the court in passing upon the Board's petition for enforcement of its order, and we shall assume that any such delay is immaterial.

With respect to the six men who were discharged several months before the Act became effective, this case raises an interesting and novel question of statutory construction. As the Board itself has held, the discharges themselves are not the subject of complaint; it is the failure to reemploy the men after the Act came into force that is charged as an unfair labor practice. Nevertheless, the Board took evidence as to the circumstances surrounding the discharges for the light they might throw on the respondent's refusals to reemploy. It appears that in May 1934 a charter was obtained from the American Federation of Labor, and Casket Makers Union 19559 was formed. All seven of the discharged employees mentioned in the complaint were leaders of the movement to organize this union. They attempted to

keep secret the formation of it; no formal notice of the organization of the union was at any time given the respondent and at no time did the union request the respondent to bargain collectively. In the autumn of 1934 the membership of the union embraced 60 to 65 per cent. of the 265 employees in the Oneida plant, but at the time of the hearings in November 1935 the membership had dwindled to about seven, barely sufficient to retain the union charter. Of the six men discharged prior to July 1935, one was discharged in November 1934, four in December 1934 and one in February 1935; they were refused reemployment shortly after the Act became effective. On their behalf evidence was offered that their union activity was the cause of their discharge and the reason for not reemploying them. The respondent gave testimony to show other and justifiable reasons, but the Board made a finding (at folio 1288) that the respondent discriminated against its employees in regard to hire and tenure of employment, which we think may be taken as a sufficiently explicit finding that the men were denied reemployment because of their union activities; and in the Board's supplemental decision are findings to the effect that positions substantially equivalent to those they formerly held were available at the Oneida plant on the dates, or shortly thereafter, when they respectively applied for reemployment, and were filled by the employment of other workmen. While the sufficiency of the evidence to sustain these findings is challenged, there is certainly some evidence to support them. Under section 10(e) the court's power to reverse findings of fact is limited to cases where there is no substantial evidence to support the findings. Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126; Ballston-Stillwater Co. v. National Labor Relations Board, 2 Cir., 98 F.2d 758, 760. On this record we must accept them. Therefore the legal question presented is whether it was an unfair labor practice to refuse to employ, because of their prior union activities, workmen who had ceased to be employees long before the Act came into effect but who thereafter and when work was available applied for employment.

The provisions of the Act upon which the Board relies are two, section 8(3), 29 U.S.C.A. § 158(3), and section 10(c), 29 U.S.C.A. § 160(c). The former declares—

"It shall be an unfair labor practice for an employer—

\* \* \* \* \* \*

"(3) By discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: Provided, That nothing in this chapter \* \* \* shall preclude an employer from making an agreement with a labor organization \* \* \* to require as a condition of employment membership therein, if such labor organization is the representative of the employees as provided in section 159(a) of this title, \* \* \*."

Section 10(c) states that the Board shall order "\* \* \* such affirmative action, including reinstatement of employees with or without back pay, as will effectuate the policies of this chapter," i. e., of the Act.

■■ It must be emphasized at the outset of the discussion that we are not dealing with the "reinstatement of employees" in considering the cases of the six men who were discharged before the Act went into effect. They had long ceased to be employees of the respondent. Nor did they retain their former status by virtue of the definition of "employee" in section 2(3), 29 U.S.C.A. § 152(3), which includes any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment. Concededly their discharge was not an unfair labor practice. Nor had their work ceased in consequence of any labor dispute that was "current" when the Act went into effect, as was the case in Jeffery-DeWitt Insulator Co. v. National Labor Relations Board, 4 Cir., 91 F.2d 134, 112 A.L.R. 948 where employees were out on strike when the Act became effective. See also, National Labor Relations Board v. Carlisle Lumber Co., 9 Cir., 94 F.2d 138. After the Act comes into force its definition of "employee" becomes operative and may declare that an individual "whose work has ceased" because of certain types of conduct by his employer shall still be treated as an employee for the purposes of the statute; but to hold that the definition includes workmen who were discharged months or even years before would give the definition a retroactive effect contrary to the customary canons of interpretation and not

required by the statutory language. In the case at bar, when the discharged men applied for employment in July and August 1935, their status was merely that of applicants for work. Indeed, the Board's argument treats them only as such and advances the broad proposition that the Act forbids discriminatory refusal to employ an applicant because of his union affiliations, and justifies awarding to him the compensation he would have earned, if the employer had not preferred to employ a non-union man.

. Section 8(3) is said to make such refusal an unfair labor practice. We do not so read it. By inverting the order of certain clauses the meaning becomes clearer. It is declared to be an unfair labor practice "to encourage or discourage membership in any labor organization by discrimination in regard to hire or tenure of employment or any term or condition of employment," except as stated in the proviso. In the connection in which it is used "hire" may well be a noun meaning wages; but lest this be thought to ascribe excessive grammatical nicety to the legislative draftsman, we will take "hire" as equivalent to "hiring." As we read the section it means that an employer may not require an applicant for work, as a condition to accepting him for employment, to join or to resign from a union, nor insert in the contract of employment any other discriminatory term that encourages or discourages membership in a labor organization, excepting only that, if the facts stated in the proviso exist, the employer may require membership in the labor organization which has been legally chosen to represent his employees. So interpreted the section is in harmony with the fundamental policy of the Act which is to safeguard the rights of employees to self-organization and collective bargaining. National Labor Relations Board v. Fansteel Metallurgical Corp., 306 U.S. 240, 257, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599. The section confers rights upon employees, not upon applicants for employment. As Mr. Justice Roberts remarked in Associated Press v. National Labor Relations Board, 301 U.S. 103, 132, 57 S.Ct. 650, 655, 81 L.Ed. 953, "The act does not compel the petitioner to employ any one." And the Chief Justice said in National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 45, 57 S.Ct. 615, 628, 81 L.Ed. 893, 108 A.L.R. 1352:

"The act does not interfere with the normal exercise of the right of the employer to select its employees or to discharge them. The employer may not, under cover of that right, intimidate or coerce its employees with respect to their self-organization and representation, and, on the other hand, the Board is not entitled to make its authority a pretext for interference with the right of discharge when that right is exercised for other reasons than such intimidation and coercion."

The purpose of the Act is not to compel an employer to hire members of one union rather than another, or union men rather than non-union men. We do not understand, therefore, that an employer may not, under pain of committing an unfair labor practice, select an A. F. of L. member in preference to a C. I. O. member, or a non-union man in preference to either, if all three are applicants for the same position. It should be noted that the Board's reading of § 8(3) would not lead to the hiring of union rather than non-union men in all instances. Where the employer hired a union man rather than a non-union man of equal merit because the former was a member of a union, there would be discrimination in hire which tended to encourage membership in a labor organization, an unfair labor practice in the Board's eyes. The Board would then have to act to enforce the rights of the non-union men not to be so discriminated against. Between applicants for work who are not employees at the time they apply for employment, we think the employer is free to choose one who has not previously engaged in union activities in preference to one who has, and vice versa, although he may not impose by the contract of employment any limitation in respect to union or anti-union activities during the term of employment. The Board has held to the contrary in the case at bar and in Waumbec Mills, Inc., 1939, 15 N.L.R.B. No. 4, commented upon in 53 Harv.L.Rev. 141. We cannot agree with its construction of section 8(3). No court, so far as we are informed, has previously had to pass upon it.

 Nor do we find justification in section 10(c) for awarding to an applicant rejected because the employer preferred to hire a non-union applicant, the wages the rejected applicant would have earned

had he been employed. Such affirmative relief is certainly not the "reinstatement of employees;" nor does it, assuming that affirmative relief may in a proper case go beyond the reinstatement of employees, "effectuate the policies" of the Act. It goes far beyond such policies, and in effect promotes a policy that would result in the employment of only union labor. Such a policy should not be read into the statute without very explicit expression. Indeed, if such were the policy, it is difficult to see how it would be possible to enforce it between applicants of equal merit belonging to different unions, for the employment of one would necessarily encourage membership in his union and discourage membership in the union to which the rejected applicant belonged. As the Chief Justice explained in the Fansteel case, 306 U.S. 240, at page 258, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599, the affirmative action authorized by the section is action to make effective the redress of rights conferred upon employees by the Act, that is to say, the rights of self-organization and of collective bargaining. Mr. Justice Stone stated the point even more definitely in his concurring opinion 306 U.S. at page 263, 59 S.Ct. at page 499, 83 L.Ed. 627, 123 A.L.R. 599:

"By § 10(c) the Board is given authority to reinstate in their employment only those who are 'employees.'"

See, also, Black Diamond S. S. Corp. v. National Labor Relations Board, 2 Cir., 94 F.2d 875, 879, certiorari denied 304 U.S. 579, 58 S.Ct. 1044, 82 L.Ed. 1542. In our opinion the order awarding damages to the six men who had ceased to be employees long before the Act went into effect must be reversed.

■■■ There remains to be considered the case of Rudolph Lechner who was discharged on July 15, 1935, after the Act was in effect. It is clearly within the power of the Board to order his reinstatement with back pay, if his discharge was because of union activities. The Board so found and the only question is whether the evidence is sufficient to support its finding. At the hearings the reason assigned by the respondent for his discharge was habitual tardiness. During 1934 and 1935 he was late on more than 20 per cent. of his working days. He admitted on cross examination that the foreman had cautioned him a great many times about being late. Yet the Board made a finding that Lechner

testified that he had never been warned. We can find no such testimony in the record. He did testify, however, that nothing was said about his tardiness at the time he was laid off, and this was confirmed by the foreman's testimony. The failure to notify Lechner that this was the reason naturally raises some doubt as to whether it was really the cause of his discharge. Knaus, the plant manager, testified that he told Lechner shortly after the foreman laid him off that his tardiness was the cause, but Lechner denies it. The Board accepted the workman's testimony in preference to the manager's. Lechner had been active in forming the union and in soliciting members for it. He was also an officer, and the only union officer still in the respondent's employ at the time of his discharge. When an employee admits that he has been derelict in complying with the employer's rule, the Board ought not lightly to infer that such dereliction was not the cause of his discharge. See National Labor Relations Board v. Thompson Products, Inc., 6 Cir., 97 F.2d 13, 17. Nevertheless, we cannot say that the Board's finding is unsupported by any substantial evidence.

For the foregoing reasons the Board's amended order must be modified by striking from paragraph 2(a) thereof the names of all men except Rudolph Lechner, striking out the word "each" preceding the words "such employee" in paragraph 2(b), and deleting entirely paragraphs 2(c) and 2(d). An order of this court may be entered enforcing the Board's order as thus modified. In so ordering we are not to be understood as approving as valid the provision in paragraph 2(b) which directs the deduction from the amount otherwise due to Lechner, of "monies received by him during said period for work performed upon Federal, State, county, municipal or other relief projects" and the payment of "the amount so deducted to the appropriate fiscal agency of the Federal, State, county, municipal or other government or governments which supplied the funds for said work relief projects." The validity of this provision has not been argued and we express no opinion on the point. Cf. 53 Harv.L.Rev. 141.

L. HAND, Circuit Judge, (dissenting).

As I view this case we are not presented with the question whether it is an "unfair labor practice" to refuse, because of their union activities, to employ those who have

never been employees; that point I reserve. Nor need we say whether § 10(c), 29 U.S.C.A. § 160(c), confines "reinstatement" to "employees". We must, however, say whether it is an "unfair labor practice" merely to refuse to employ "employees" because of their union activities, and whether such a refusal entitles them to reinstatement. I do not doubt either; surely it tends to "discourage membership in any labor organization" to know that a record of union agitation will prevent one from getting back one's old job. Hence, if these six men were "employees", when the company rejected them, the Board was right. It is true that, if so, they were such only because of events which took place before the law was passed, but that seems to me irrelevant. At least it is plain that to hold them "employees" does not make the act operate retrospectively. The company was charged with notice, when it rejected any applications of those who had been active in forming the union, that it was unlawful to do so if they were its "employees". Like every one else it took its chances of how courts might define that word. Therefore, the case comes down merely to how we should define it, and to me it seems that both in language and in purpose § 2(3), 29 U.S.C.A. § 152(3), covers those who ceased work before the law became effective. I can see nothing in the language to justify a more limited construction. The relevant words are: "any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute", § 2(3); and a " 'labor dispute' includes any controversy * * * concerning the * * * representation of persons in negotiating * * * terms * * * of employment", § 2(9). These six men had in fact ceased work as a consequence of a controversy concerning the representation of persons in negotiating terms of employment. Possibly they had ceased work also in consequence of an "unfair labor practice", but that is more debatable, and, arguendo, I will assume the opposite. So much for the text. If, on the other hand, we look to the purpose of §.10(c), the same result follows, for I can think of no reason why those who have lost their jobs before there was any law, should be denied the protection given to those who lose them afterwards. Their rejection after the law takes effect equally discriminates against them; the line between them and the others is purely adventitious and without basis in any state-

able policy; and I cannot doubt what Congress would have done, had the situation been presented to it. Thus, text and spirit unite; and at the same time the statute remains prospective in its operation. I think we should affirm the order, though I join in my brothers' caveat as to that part of it which directs the company to pay any money to those agencies of relief which supported the men during their unemployment.