## NATIONAL LABOR RELATIONS BOARD v. LEVITON MFG. CO., Inc.

### No. 297.

Circuit Court of Appeals, Second Circuit.
April 29, 1940.

Leonard Appel, Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, Laurence A. Knapp, Asst. Gen. Counsel, and Richard C. Barrett and Thomas F. Wilson, Attys., National Labor Relations Board, all of Washington, D. C., for petitioner.

William L. Schwartz, of New York City (Jeremiah T. Mahoney, of New York City, and George A. Spohr, Jr., of counsel), for respondent.

Before L. HAND, AUGUSTUS N. HAND, and PATTERSON, Circuit Judges.

L. HAND, Circuit Judge.

This cause comes before us upon a motion of the National Labor Relations Board for an order of this court, enforcing its own order against the respondent company. Only two questions arise: Whether there was any substantial evidence to support the finding that one, Levine, an employee of the company, was discharged because of his union activities; and whether, if so, that part of the order was valid which directed the company, after deducting from Levine's back pay any money received "for work performed upon Federal, State, county, municipal, or other work-relief proj-ects", to "pay over the amount, so deducted, to the appropriate fiscal agency of the * * * governments which supplied the fund for said work-relief projects". The evidence was in conflict as to whether Levine had quit the company of his own accord, or whether he had been discharged; one member of the Board dissented, believing that no case had been made out. The evidence in support of the complaint was that Levine began to work for the company in April, 1934, and had worked steadily until the spring of 1937, except for an eight weeks illness. In March of that year he joined a C. I. O. union and persuaded two other employees to do so (the union was just beginning to try to organize the plant) and the three became active proselytizers. The company's business was increasing, and on Friday, April 2, its superintendent announced that the "bakelite division" must work Sundays; Levine protested against this on behalf of the men in that day division, and on Monday, the 5th, one Kupferman, one of the company's salesmen, and a friend of Levine's, asked Levine to meet him at 5:30 P. M. outside the plant. Levine got leave to quit early from his assistant foreman—who said that he "knew about it"—and met Kupferman as arranged. Kupferman then asked Levine why he was "ringleader" and the "center of everything"; and told him that he, Kupferman, was in "hot water" with the company, presumably because of his intimacy with Levine. Kupferman then promised Levine a job elsewhere, and dictated a resignation in which Levine said that he was leaving of his "own accord" because he had prospects of better pay and work more to his liking. That same evening Kupferman called upon him at his home and told him to disregard their talk, and to go to work as usual, which he did on Tuesday and Wednesday. On that day Kupferman gave him his pay, and told him not to come back because he was "organizing the plant", and that the company's president would not "stand for any union". All this depended upon Levine's testimony, corroborated, as to Kupferman's interview at Levine's home, by Levine's wife. The respondent's witnesses told the following story. The superintendent of the bakelite division, Swanson, said that Levine came in on Monday, April 5th, and told him he was going to quit because he was afraid that he was getting sick again. Swanson told him that the company had recently begun to get

written resignations from employees, and that he would "appreciate" one from Levine; Levine thereupon wrote out the resignation giving as the cause of his leaving the prospect of a better job. Later on that day Swanson told the plant superintendent, Leavenworth, that Levine was going to quit, and Leavenworth answered that this would be embarrassing, and went to Kupferman and asked him to persuade Levine to stay until another experienced bakelite molder could be obtained. Leavenworth and Kupferman corroborated this story. Kupferman did persuade him to stay, and on Wednesday, the 7th, Swanson thanked him for doing so and paid him his wages. Levine concededly filed a charge with the Board against the company on Friday, the 9th, on the ground of a discharge for union activity.

██ It is apparent from the foregoing that the case is one in which, despite the dissent of one member, the Board's finding is final; and that we must not say that it was bound to disbelieve Levine's testimony. True, it was possible that he might have concealed his real reason for leaving, because he did not want to make a written record of his illness; but it was extraordinary for him to quit just as he had begun to organize the shop for a militant union, giving illness as an excuse; and it was particularly perfidious for him to turn about in forty-eight hours and charge that he had been discharged for union activity. There is no suggestion that his illness was acute, or came upon him suddenly; indeed he was said to have spoken of it before he protested about the Sunday work. We are not even certain that in the Board's place we might not have voted with the majority; at any rate there was substantial evidence to support their finding.

██ ██ The Third Circuit has twice passed upon the second point in the Board's favor, though without more discussion than to say that they thought it within the power of "affirmative action" to "effectuate the policies" of the act which § 10 (c), 29 U.S. C.A. § 160 (c), confers. Republic Steel Corp. v. National Labor Relations Board, 3 Cir., 107 F.2d 472, 478; Union Drawn Steel Co. v. Nat. Labor Rel. Board, 3 Cir., 109 F. 2d 587, 594. We cannot see that the point was ruled in National Labor Rel. Board v. Planters Manufacturing Co., 4 Cir., 105 F. 2d 750, 753. The "affirmative action" which the section contemplates must be re-medial, and not punitive or disciplinary (Consolidated Edison Co. v. Nat. Labor Rel. Board, 305 U.S. 197, 236, 59 S.Ct. 206, 83 L.Ed. 126; National Labor Rel. Board v. Fansteel Metallurgical Corp., 306 U.S. 240, 257, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599; Nat. Labor Rel. Board v. Newport News Shipbuilding Co., 308 U. S. 241, 250, 60 S.Ct. 203, 84 L.Ed. ——), and the order, qua payments, must therefore be confined to restitution for the wrong done, however widely that should be conceived. The Board itself has always deducted from the wages to be recovered what the employee may have earned meanwhile, and it is impossible to see how it could have done less, whatever may be proper as to what he could have earned by reasonable efforts, but did not. His receipts may be of three kinds: Wages from a private employer; wages from a public agency; alms or a dole. As to the first, the Board has never suggested that the employer must pay to another private employer what that employer paid to the employee, and obviously, that would be absurd. Since the order speaks of "monies received * * * for work performed", we need not consider alms, or a dole. "Monies received * * * for work performed" may be no more than a fair return for services rendered, or they might have been deliberately made higher, the margin being dole; and the record at bar does not contain any evidence on the point. At most, any such provision would have to be confined to such a margin; we do not suggest that even then it would be valid. However, the whole administration of "work-relief" was conceived in a spirit exactly the opposite of charity; the very purpose of it was that the employees should understand themselves not to be the objects of charity, but to be performing work of a value equal to what they received. As the case stands, therefore, there is no more reason why the company should be compelled under the guise of restitution, to subvene the public enterprises on which Levine worked, than if these had been the ventures of a private capitalist. We must assume that he gave as much as he got, and the order pro tanto transferred the burden of the public improvement from the public, which presumably is to profit by it, to the company which will do so only as a member of the public. There could be no clearer instance of a punitive measure than that. There should

therefore be deleted from Article II (e) of the order all that part beginning with the words, "deducting, however, from the amount" etc.

Order modified as above; motion for an enforcement order granted.