# PHELPS DODGE CORPORATION v. NATIONAL LABOR RELATIONS BOARD.

## No. 350.

Circuit Court of Appeals, Second Circuit.
July 11, 1940.

Ellinwood & Ross, of Phoenix, Ariz., and Debevoise, Stevenson, Plimpton & Page, of New York City (Denison Kitchel, of Phoenix, Ariz., and William E. Stevenson, of New York City, of counsel), for petitioner.

Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, Laurence A. Knapp, Asst. Gen. Counsel, Alvin J. Rockwell, Mortimer B. Wolf, and Morris P. Glushien, Attys., all of Washington, D. C., for respondent.

Before L. HAND, CHASE, and PATTERSON, Circuit Judges.

CHASE, Circuit Judge.

This case is before us on the petition of the Phelps Dodge Corporation, a New York corporation doing business in the Southern District of New York, with its principal office in the City of New York, for the review of an order of the National Labor Relations Board requiring the reinstatement of striking employees and two others with back pay. It involves questions as to the scope of the term "employee" within the meaning of the National Labor

204

Relations Act, 49 Stat. 449, 29 U.S.C.A. § 151 et seq., of which some have already been considered by this court in National Labor Relations Board v. National Casket Co., 2 Cir., 107 F.2d 992.

■ The Board answered the petition and requested the enforcement of the order with the sole modification that the language of the notice to be posted by the petitioner to the effect that it will cease and desist from conduct prohibited be in accord with the more recent practice of the Board in that respect following the decision Art Metals Construction Co. v. National Labor Relations Board, 2 Cir., 110 F.2d 148. The proposed modification is that the notices state that petitioner "will not engage in conduct from which it is ordered to cease and desist in paragraph (a) and (b) of this Order * * * ". This modification is now ordered as requested.

Both our jurisdiction which is based upon Sec. 10 (e) of the above Act and the interstate character of the business of the petitioner are clearly established and unquestioned.

The unfair labor practices found by the Board were based on charges filed by the International Union of Mine, Mill and Smelter Workers, Local No. 30 and were proved to have occurred at a copper mine owned and operated by the petitioner at Bisbee, Arizona, in the summer of 1935. They consisted of refusals, because of their union affiliations or activities, to hire applicants for employment and to reinstate employees who had engaged in a strike. The Board found that the petitioner had violated Sec. 8 (1) and (3) of the Act in one or the other of these respects by discriminating against forty named men; dismissed the allegations as to five men; and ordered the petitioner to offer employment with back pay to thirty-nine of the forty together with back pay to the remaining one up to a time when he became unemployable. As the trial examiner had recommended dismissal of the complaint as to three of the men the Board ordered reinstated, no back pay was allowed them between the date of the intermediate report of the examiner and the date of the order of the Board.

The findings that are supported by substantial evidence show the petitioner's mine at Bisbee, known as the Copper Queen Mine, was an "open-shop camp" until the Union began its attempt at organization there in September, 1933. This

attempt was resisted by the petitioner but the union by June 10, 1935, had a membership sufficiently large to be reckoned with, though still a small minority of the approximately 950 employees the petitioner had at work at the mine. On June 6, 1935, the petitioner discharged eight of these union men. The following evening the union voted to strike on June 10th because of such discharges and on the last mentioned date about ten per cent of the petitioner's employees stopped work and established picket lines at mine entrances. Picket lines were maintained until August 24, 1935, when the strike was terminated by the union because of its failure and the picketing was discontinued.

The Board found that by June 28th the petitioner had succeeded in filling the places of all the strikers and had resumed normal operations at the mine. After that and at times before and after the strike was given up by the union on August 24th, the petitioner increased the number of its employees but in doing so consistently refused to reinstate any of the strikers though they applied for reinstatement in August when the petitioner was hiring men for work similar to that for which they applied and the refusal of employment was clearly because of their union membership and activities.

After the labor trouble in June, 1935, above referred to, the National Labor Relations Act became effective on July 5, 1935, but this was after the date on which the Board found that the mine had resumed normal operations with the places of the strikers taken by other employees. From this it is argued by the petitioner that there was no current labor dispute when the Act became effective on July 5th, and consequently that its subsequent refusal to reinstate any of the strikers because they were union men was not unlawful since they were not employees within the meaning of the Act.

■ Though the union had, before the effective date of the Act, apparently been shown to be too weak to win the strike or even to disrupt seriously the working of the mine, we think it clear that a labor dispute still existed which was then "current" as the Board found. That was a question of fact which we can review only to the extent of determining whether or not there was substantial evidence to support it. That there was such evidence is

shown by the proof of the maintenance of the picket lines coupled with several acknowledgements by the petitioner itself after July 5th that it recognized the continued existence of the strike. Reliance is placed by the petitioner upon decisions to the effect that a strike cannot exist unless the employer has notice of definite demands to be met and given an opportunity to meet them but none of them dealt with what is a current labor dispute within the meaning of the statute controlling here and, while interesting, are presently of little help. Nor is it decisive that normal production in the mine had been attained though in Quinlivian v. Dail-Overland Co., 6 Cir., 274 F. 56 it was, indeed, held in deciding a controversy involving the Clayton Act that strikers ceased to be employees after the employer had its plant in full production even though such strikers continued their efforts to maintain the strike. The definition of employee in the National Labor Relations Act is very broad and should not be narrowed to make abortive the remedial purposes of the statute. It includes "any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and, who has not obtained any other regular and substantially equivalent employment". 29 U.S.C.A. § 152 (3). Had the Act been effective when the strike began in June there would, of course, be no question about the retention by the strikers of their status, under the statute, as employees. The sufficiently supported finding of the Board, however, carries the labor dispute into July 5th and that is enough to make the strikers employees within the meaning of the Act when they were refused reinstatement. Jefferey-DeWitt Insulator Co. v. National Labor Relations Board, 4 Cir., 91 F.2d 134, 112 A.L.R. 948; Standard Lime & Stone Co. v. National Labor Relations Board, 4 Cir., 97 F.2d 531. See also, National Labor Relations Board v. National Casket Co., 2 Cir., 107 F.2d 992, 996. The question of whether there was a current labor dispute after the mine resumed normal operations with the strikers' places filled should not be confused with whether or not it would have been an unfair labor practice to refuse to re-employ the strikers after normal operations had been resumed, on the ground that that would have made necessary the discharge of the men who had taken their places. As to whether or not an employer may lawfully refuse re-employment for that reason, see National Labor Relations Board v. Columbian Co., 306 U.S. 292, 59 S.Ct. 501, 83 L. Ed. 660, and National Labor Relations Board v. Mackay Co., 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381.

Some of the strikers, who were ordered reinstated did obtain employment. Part of them were employed by the Shattuck Denn Mining Company which operated a similar mine in Bisbee only a short distance from the mine of the petitioner. They secured work of a similar nature under similar conditions at similar rates of pay; in some instances at higher wages. Though the Shattuck Denn Mining Company was smaller than the petitioner it was shown to be a steady employer of this kind of labor. There may have been some loss of seniority rights but that would doubtless often be a result of a change in employment and what that loss may have been was not adequately shown. Unless it was a substantial loss, the Board's decision to the effect that those men who were employed by the Shattuck Denn Mining Company did not at the time they went to work there obtain substantially equivalent employment cannot stand and they then ceased to be employees subject to reinstatement. Mooresville Cotton Mills v. National Labor Relations Board, 4 Cir., 94 F.2d 61; National Labor Relations Board v. Carlisle Lumber Co., 9 Cir., 99 F.2d 533. In order that this question of fact may be determined, there will be a remand to the Board for further findings upon such evidence as the parties may present.

The strikers did, in any event, lose some time because of the unfair labor practice of the petitioner in refusing to reinstate them while they were employees. It is true that the language of the Act couples reinstatement and back pay in such a way that it has been held that the latter cannot be ordered by the Board unless reinstatement is also. National Labor Relations Board v. Carlisle Lumber Co., supra. But that seems to diminish unduly the scope of the Board's broad power to take some of the economic pinch out of labor troubles. We think the Act authorizes the Board to relieve an employee from loss of pay during the time an unfair labor practice has been the cause of the loss and during which it is a sufficient reason for his then reinstatement whether he may be reinstated as

of the time the order is made or not. Mooresville Cotton Mills v. National Labor Relations Board, supra.

 The findings of the Board to the effect that the strikers who obtained employment other than from the Shattuck Denn Mining Company did not obtain substantially equivalent pay is supported by the evidence and the order for their reinstatement with back pay is, accordingly, upheld except in respect to the amount of back pay awarded to those who elsewhere obtained employment, not substantially equivalent, and then voluntarily relinquished that. There is no reason to suppose that Congress intended to have those who had unlawfully been deprived of their jobs maintained in idleness beyond the period when they had an opportunity to do work they were fitted to perform. They were bound to use reasonable efforts to find work and to keep employed. It is only to the extent that their earnings were diminished after they made such efforts that they are entitled to be made whole. The same rule that applies to a discharged employee who sues for a breach of contract is applicable to them. Accordingly, the amount allowed each such employee should be the difference between his actual earnings plus what he failed without excuse to earn and the amount he would have earned but for the unfair labor practices of the petitioner.

 We have included among those called strikers a man named Cornett who had not worked for the petitioner for several years before the strike but who was employed on June 7, 1935, to begin work on June 10th, the day the strike began. He failed to report for work on that day and joined the picket line on the following day. It is contended that he was not an employee but we can find no substance in that argument. He was admittedly hired. That contract fixed his relationship to the petitioner regardless of whether or not he actually worked before he joined the strikers.

 There were two men ordered reinstated who were not employees within our decision in National Labor Relations Board v. National Casket Co., supra. They are Daugherty who left the employ of the petitioner on Oct. 15, 1934; who never thereafter was employed by the petitioner; and who was refused employment on January 15, 1937, because of his union affiliations. Another was Curtis who was discharged by the petitioner on June 15, 1934, and who, because of his union membership, was refused re-employment in 1935 after the Act became effective. For the reasons stated in the case last above mentioned we hold that these two men were not employees and that the Board was without power to order the petitioner to offer them employment.

Though there was considerable delay both in filing the charges with the Board and in proceedings thereafter to the final order to all of which the petitioner has called our attention, we are not prepared to say on this record that it has a just grievance on that score.

 One further modification of the order is, however, required. The Board ordered the petitioner to deduct from the amount otherwise due each employee awarded back pay whatever had been received during the period "for work performed upon Federal, State, county, municipal, or other work relief projects, and pay over the amount, so deducted, to the appropriate fiscal agency of the Federal, State, county, municipal, or other government or governments which applied for said work-relief projects". This part of the order went beyond the power of the Board and should be omitted. National Labor Relations Board v. Leviton Manufacturing Co. Inc., 2 Cir., 111 F.2d 619, decided April 29, 1940.

The order of the Board is modified in accordance with this opinion and, as so modified, the motion for an enforcement order is granted.

L. HAND, Circuit Judge (concurring).

I agree that the men who were on strike on July 5, 1935, were entitled to reinstatement, though not because the dispute which caused them to quit their jobs, was "current" when the act took effect. If I were free to decide, I should hold that it was an "unfair labor practice" to discriminate against anyone, whether an "employee", or not. Section eight has five subdivisions and two of them—two and three—do not use the word. Moreover, not only does the text for that reason not require that these subdivisions shall be limited to employees, but the predominant purpose of the act as a whole requires an opposite construction. One can as effectively interfere with the rights which § 7 se-

cures by refusing to hire as by discharging; that is, unless we interpret "employees" in § 7, as limited to persons actually employed at the moment, which would certainly mutilate the act. Nor am I moved by the argument that the employer must be free to hire whom he will. The whole purpose is to limit his liberty so far as its exercise may invade the new rights created; and I can see no greater limitation in denying him the power to discriminate in hiring, than in discharging. Except for National Labor Relations Board v. National Casket Company, 2 Cir., 107 F.2d 992, I should therefore have sustained the order, not only as to those on strike when the "unfair labor practice" occurred, but as to the two who were not on any theory "employees" at that time. But, having taken part in that decision and my notions being then overruled, I regard it as authoritative. It is another question whether anyone who is not an "employee", is entitled to reinstatement, but that I pass, because it does not arise if it was not an "unfair labor practice" to discriminate against the two men in question.