**STEWART DIE CASTING CORPORATION
v. NATIONAL LABOR RELATIONS
BOARD.**

No. 7132.

Circuit Court of Appeals, Seventh Circuit.
July 3, 1940.

Rehearing Denied Oct. 18, 1940.

Silas H. Strawn, Frank H. Towner, and Thomas S. Tyler, all of Chicago, Ill. (Winston, Strawn & Shaw, of Chicago, Ill., of counsel), for petitioner.

Thomas L. Owens, of Chicago, Ill., for United Automobile Workers of America, Local 298, intervening petitioner.

Chas. Fahy, General Counsel, N. L. R. B., Robt. B. Watts, Assoc. Gen. Counsel, N. L. R. B., Laurence A. Knapp, Gen. Counsel, Ernest A. Gross, Bertram Edises, and Owsley Vose, all of Washington, D. C., for respondent.

Before EVANS and MAJOR, Circuit Judges, and LINDLEY, District Judge.

MAJOR, Circuit Judge.

This is a petition to review and set aside an order of the National Labor Relations Board issued pursuant to Section 10(c) of the National Labor Relations Act, 29 U. S.C.A. § 151 et seq. In answer to the petition, the Board has requested enforcement of its order. Two separate proceedings were instituted against the petitioner, the first referred to as Case No. C-577, and the second as Case No. C-869. The two proceedings were subsequently consolidated and disposed of by the Board in the same decision and order.

Case No. C-577 was predicated upon charges filed by United Automobile Workers of America, Local 298 (afterwards referred to as the "Union") and complaint issued thereon January 4, 1938. Briefly, petitioner was charged with unfair labor practices by refusing to bargain collectively with the Union, which caused its employees to participate in a strike; that it refused to reinstate certain of its striking employees because of their union activity; that certain employees were discharged because of such activity, and that it made derogatory statements concerning the Union and urged and warned its employees against joining or retaining membership therein. After a denial of the motion to dismiss the complaint, petitioner answered, denying all charges. A hearing was had before a trial examiner from January 20 to and including February 9, 1938. An intermediate report was filed by the Examiner to which petitioner filed exceptions on May 4, 1938.

Proceedings in Case No. C-869 were the result of a complaint filed with the Board on June 16, 1938, by certain individual employees. It was charged that from February 1, 1938, petitioner reduced the days of employment per week of Bernice Andrews, discharging her on February 21, 1938, and on May 10, 1938, discharged John Adrian, on May 5, 1938, discharged Charles Anusewicz, and on May 20, 1938, discharged Con Buller, for the reason that they and each of them had joined and assisted the Un-

ion and had given testimony in the previous proceedings unfavorable to petitioner, and that as a result, petitioner was guilty of certain designated unfair labor practices. Petitioner, by answer, denied such charges.

A hearing was had in this proceeding from June 21 through and including June 24, 1938, before a trial examiner and subsequent to the time the two proceedings had been consolidated. Exceptions were filed to the intermediate report of the Trial Examiner. Oral argument was had before the Board in Washington, D. C., participated in by counsel for the petitioner, the Union and the Board. The Board's decision and order, now under review, was entered as amended on August 23, 1939.

The Board decided that petitioner, in violation of Section 8(5) of the Act, on March 23, April 9 and 17, June 21 and 24, 1937, and thereafter, refused to recognize and bargain collectively with the Union, although that organization represented a majority of its employees in an appropriate unit; that from March 16 to June 24, 1937, petitioner violated Section 8(1) of the Act by warning its employees against collective bargaining through the Union, and made derogatory statements concerning the Union, thereby interfering with, restraining and coercing its employees in violation of Section 7 of the Act; that petitioner violated Section 8(3) of the Act by denying reinstatement on or about June 24, 1937, to 165 named employees because of their membership in, and activity on behalf of, the Union; that petitioner further violated Section 8(3) of the Act subsequent to reinstating 52 of the 165 employees referred to above, and laid 41 of them off because of their Union activities. It was further decided that petitioner laid off Bernice Andrews on February 21, 1938, Charles Anusewicz on May 5, 1938, and John Adrian on May 10, 1938, because of their membership and activity in the Union, thereby further violating Section 8(3) of the Act, and by such acts interfered with, restrained and coerced such employees in the exercise of rights guaranteed by Section 7, thus violating Section 8(1) of the Act.

In addition to the usual cease and desist order, petitioner was required to take the following affirmative action: (a) offer reinstatement to all employees unlawfully discriminated against (excluding those already reinstated) and make them whole for any loss of pay suffered by reason of petitioner's discrimination; (b) upon appli-

cation, offer to all employees who were on strike on May 23, 1937, and thereafter, immediate and full reinstatement with back pay from the date of any refusal of their application for reinstatement; (c) restore without prejudice to the employees who were on strike on March 23, 1937, their seniority rights; (d) upon request, bargain collectively with the Union and if an understanding is reached, embody said understanding in a signed agreement, and (e) · deduct from the back pay due each employee under all provisions of the order a sum equal to that received by such employee for work done upon Federal, State, county, municipal or other work-relief projects during the period for which back pay is due under the order, and pay such amount deducted to the appropriate fiscal agency of the Federal, State, county or municipal government financing such projects.

Petitioner states a large number of contested issues. Among these are (1) whether the Union was a proper collective bargaining agent on March 22, 1937, and thereafter, of the company's employees; (2) whether the company, on March 23, 1937, and thereafter, refused to bargain collectively with the Union; (3) whether certain employees, because of their strike activities, lost their status as employees and thereby, the benefits of the Act; and (4) whether the petitioner was guilty of coercion and discrimination against its employees because of their connection with, and activity in behalf of, the Union. It is apparent that the Board's order with respect to these issues involves largely questions of fact.

Other issues are presented involving questions of law. They are (1) the requirement of the Board that petitioner reimburse Federal, State, county and municipal agencies for any sums paid to petitioner's employees during the period for which back pay is ordered paid such employees, and (2) the requirement that petitioner enter into a written agreement with the Union concerning matters agreed upon as a result of collective bargaining.

■ The issues of fact having been determined by the Board adversely to petitioner's contention are, of course, binding upon us if supported by substantial evidence. It seems the time has passed when a court can hope to serve any useful purpose by an extensive review of the evidence and certainly there is no occasion to do so beyond the point of ascertaining if the record furnishes such support. In the beginning, we think it is proper to state that we have carefully examined the voluminous record and are convinced that the findings have substantial support. We shall, therefore, only discuss briefly the more pertinent evidence material to such findings.

In the beginning it seems material to refer to the situation prior to March 23, 1937, the date found when petitioner first refused to recognize and bargain with the Union. The record discloses, as the Board found, that there was dissatisfaction among the employees prior to March 16, 1937. Numerous employees complained to petitioner's officials regarding wages and conditions of employment, but it appears such complaints were made in individual capacities rather than by any group or organization representing the employees. At any rate, on the early morning of March 16, 1937, a sit-down strike was staged, participated in by from 75 to 100 employees. The strikers remained inside the plant until 3 o'clock the following morning when they relinquished possession of the plant at the request of the Chicago Police. On the morning of March 17, the day shift, when they came to work, were advised by the officials of petitioner that the plant was closed, and it remained closed until March 25 when petitioner resumed operations. After the employees were informed on March 17 of the closing of the plant, a general strike ensued which lasted until June 24, 1937.

It is not contended by the Board, as we understand, that the Union which was in the process of organization, represented a majority of the employees at the commencement of the strike, but that immediately thereafter, membership in the Union rapidly increased, and that by March 22, 1937, it had a majority. It appears that the Union had no connection with the strike at its inception, including the sit-down strike.

The Board found that the company refused to bargain with the Union on March 23, April 9, April 17, June 21 and June 24, 1937, and, that the strike was continued from and after March 23 by such refusal to bargain. The Board does not find any unfair labor practice prior to March 23. It is petitioner's contention that it did not on the dates mentioned, refuse to bargain; that as a matter of fact it did bargain on such dates and, therefore, is not guilty of

unfair labor practices in that respect. Having eliminated such unfair labor practices, so its argument proceeds, neither the strike nor its continuance was the result of any violation of the Act by petitioner. In this connection, it contends that the strikers were no longer protected by the provisions of the Act—in other words, that the relation of employer and employee was severed and that petitioner was no longer under obligation to consider the strikers as employees.

Considering, as we must, the evidence most favorable in support of the Board's findings as to a refusal to recognize and bargain with the Union on the dates mentioned, it discloses that on March 22, 1937, a conference was held at the office of the Board in Chicago between a Union Committee consisting of four employees, an attorney for the Union, petitioner's president, and its attorney. At the conference it was stated by a member of the Union Committee that they wanted petitioner to recognize the Union, and in response to a question by petitioner's attorney as to what was meant by "Union recognition" it was stated they desired petitioner to recognize the Union as the representative of the employees for bargaining purposes. Petitioner's president announced that he would take the matter under advisement and shortly give the committee an answer. On March 23 (the following day), petitioner's president sent to each of petitioner's employees a mimeographed letter which purported to be a reply to the Committee, and in which it was stated that the Union's "one and only demand" was that the company "bargain with and recognize the C.I.O." The letter contained the following statement:

"So far as the presentation of any complaint is concerned, it makes no difference to me now or in the past whether they are presented by individuals or groups of employees. They will all be treated with equal courtesy and attention.

"Do not be led astray by any claim that we can be bullied or coerced by any labor organization—or that we are willing to enter into a horse trading contract with any group who claim the ability to deliver free workmen at a price."

Two days later, petitioner reopened its plant and sought, in various ways, to induce its employees to return to work. They were offered two weeks' pay for the time they had been on strike, a ten per cent wage increase, and were told that petitioner would neither recognize the Union nor sign any agreement with it. In some instances they were threatened with loss of employment if they persisted in the strike. On April 9, 1937, representatives of the Union conferred with representatives of petitioner in the office of the latter's attorneys. What was said on this occasion indicates clearly a refusal to recognize and bargain. The Union representatives were informed by attorneys for the petitioner that it would not recognize the Union "as the collective bargaining representative of all of the employees of the Company," but only as the representative of "the men who were members of their organization." It was the position of the petitioner at that meeting that it had a right to recognize anybody and everybody who requested recognition. At a similar meeting on April 17, the same attitude was manifested by petitioner. Petitioner's attorney, in referring to the demand made at that time by a Union representative for Union recognition, testified at the hearing as follows:

"* * * I told him we would not do that; that we reserved the right to bargain with any individual in our employment; that we would try to make it clear that we would bargain with any individual or with any group of individuals or with any one representing any group of individuals; that we had told them that a week before and that that was still our position."

The meetings of June 21 and June 24 were virtually the same meeting, as the latter was a continuation of the former. Before this meeting, however, petitioner's president had again by letter expressed to his employees "that it is unnecessary for any employee to join a labor union in order to get the best possible treatment." It is claimed by petitioner that at the later meetings, the strike was settled and the Union recognized. It is true the strike was terminated by an agreement between the petitioner and the striking employees, but it does not follow, as argued, that the Union was recognized. Certainly, there was no specific recognition of the Union and we think it is a reasonable inference that no such recognition was granted. There is nothing to indicate that petitioner had changed its attitude with reference to Union recognition. In our judgment, the Board was justified entirely in finding a refusal to recognize and bargain on the dates mentioned. Petitioner seeks to maintain the position that the only demand made

by the Union was that petitioner sign a written agreement recognizing the Union, and that its refusal in this respect could not constitute an unfair labor practice. If that had been the sole demand, a situation would be presented which we need not here consider. True, a written agreement was mentioned at some of the meetings, but plainly it was not the primary object sought to be attained by the Union. Even though there is some testimony which supports petitioner's theory, we are obligated to accept the testimony favorable to the Board's finding. This we have done and find it substantial.

◊ ■■ The next attack and the one relied upon by petitioner as being of vital importance, is directed at the finding that the Union, on March 22 and subsequent dates, was the proper bargaining agent of petitioner's employees. In this respect it is contended that the burden was upon the Board to prove that the Union represented a majority of the employees in the appropriate unit, and this it failed to do. In this connection, we think it is pertinent to point out that the petitioner raised this question for the first time upon the filing of its answer to the complaint in January, 1938. At none of the numerous conferences commencing March 22, 1937, was the authority of the Union questioned. At no time was the refusal to recognize the Union and bargain with it based upon a lack of majority. We think it is a fair inference that petitioner, tacitly, at least, by its silence in this respect, admitted that the Union had a majority. It is inferable also that this question injected into the proceedings before the Board was an afterthought. We do not hold that petitioner's conduct in this respect precludes it from raising the question in defense, but as a result, it finds itself in a rather awkward and unfavorable situation. Its position appears also to be inconsistent. In one breath we are urged to agree that it recognized the Union and bargained with it according to the requirements of law, and in the next breath we are urged to agree that the Union never at any time represented a majority of the unit and, therefore, petitioner was under no obligation to recognize or bargain.

Passing these apparently contradictory contentions, we shall briefly refer to the testimony in support of the Board's finding in this respect. There were 685 employees in the bargaining unit represented by the Union, and the Board found that 591 of this number were members of the Union. Petitioner attacks this finding upon the ground that it is predicated upon information contained in Exhibit 7, which has no probative value. The Exhibit contained a list of names arranged in alphabetical order of those purporting to be members of the Union. An official of the Union identified the Exhibit and testified, in effect, that it was made up from membership cards and other records of the Union. The Exhibit was admitted without objection, and afterwards, a motion was made by petitioner to strike it as not being the best evidence. Counsel for the Board offered to produce the original records showing the names of those who paid dues to the Union. Petitioner made no effort to avail itself of this offer, but appears to have been content in relying upon its motion to strike. Under the circumstances, we are not convinced that under the liberal evidence rule prevailing in a hearing of this character, the information contained in the Exhibit was improperly received and insufficient to support the finding. But whether this be correct or not, there is other evidence in the record which supports the Board's finding, and we know of no reason why we should not consider it merely from the fact that it was not mentioned in the Board's decision. Without going into detail, it is sufficient to state that one official of the Union testified that he witnessed the signing of applications by over 300 employees for membership in the Union. Another official of the Union testified that at the end of the first week of the strike (the strike commenced March 16, 1937), the Union had a membership in the neighborhood of 590. Other testimony might be pointed out to the same effect. We think there is no doubt but that the finding of the Board in this respect is substantially supported.

Petitioner argues that, included in the Union membership, were the sit-down strikers who lost their status as employees. (We shall refer later to the validity of this contention.) These are estimated at 100 in number, but even if deducted, the Union had a majority. It is also pointed out that 195 of the employees returned to work on April 5, and it is argued that this in itself is an indication that they were not members of the Union, and it is also sought to deduct this number. We think there is no merit in such contention. The fact that they returned to work proves nothing concerning their Union membership, or the

authority of the Union to act as their bargaining agent.

It having been shown that the Union had a majority on March 22, 1937, there would be a presumption that such majority continued for at least a reasonable time, and would justify the Board's finding that it continued until June 24, 1937, the last date on which petitioner was found to have refused to bargain. National Labor Relations Board v. Highland Park Mfg. Co., 4 Cir., 110 F.2d 632, decided March 11, 1940; Ritzwoller Co. v. Labor Board, 7 Cir., 114 F.2d 432, decided May 8, 1940. In this connection, petitioner offered in evidence 27 letters from employees, claimed by the Union as members, but whose membership was by the letters disclaimed. The Trial Examiner refused to admit these letters. There perhaps is merit in petitioner's contention that they were admissible, but the Examiner's refusal, if erroneous, could not have prejudiced petitioner for the reason that if the 27 employees who wrote such letters had been deducted from the Union membership, the result would not have been changed.

That part of the Board's order providing for reinstatement with back pay of certain employees depends largely upon whether they had lost their status as such prior to the settlement of the strike on June 24, 1937. Petitioner contends in the affirmative and the Board to the contrary. As already stated, the sit-down strike occurred on March 16, 1937, and became a general strike the following day. The first unfair labor practice found by the Board was petitioner's refusal to bargain and recognize the Union on March 23, 1937, and it was further found that the strike was continued as a result of this unfair labor practice. We have approved that finding.

As petitioner points out, there was no finding by the Board that a labor dispute existed at the time of the sit-down strike, although the Board now argues there was. We do not think it is necessary for us to make a decision in this respect. As petitioner properly concedes in its brief, "the strikers did not lose their status as employees if work ceased as a consequence of, or in connection with, any current labor dispute, or because of any unfair labor practice." Section 2(3) of the Act. It is argued by petitioner, however, that at the time the plant was reopened on March 25, 1937, a notice was given to all employees to return to work, and, that those who failed to comply with such notice ceased to be employees. We know of no authority which sustains this argument and we think it is without merit. We think there can be no question but that those employees who participated in the strike other than the sit-down strike, retained their status as employees. It is more difficult to reach a conclusion regarding those who participated in the sit-down strike. Perhaps more should be said concerning the facts relating thereto.

The Board, in our opinion, minimizes the importance of this incident. True, there was little, if any, damage done to petitioner's property, but the fact remains that the strikers, for a period of some twenty-four hours, took possession of petitioner's property for the purpose, evidently, of discontinuing operations. That such an act upon the part of a group of employees is unlawful is now recognized generally. We have no doubt but that petitioner would have been justified in discharging such employees and thereby severing such relation, but petitioner did not do so—in fact, in dealing with those who were on a strike it made no distinction between those who had participated in the sit-down strike and those who had not. It offered—in fact, urged and solicited—all former employees, without discrimination, to return to their jobs. Many of them did, and included in such number were some of those who participated in the sit-down strike. It is argued that the relation terminates automatically where the latter participate in a sit-down strike. National Labor Relations Board v. Fansteel Corp., 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599, is relied upon as authority for such position. We do not believe, however, that this case supports the contention. On page 252 of 306 U.S., on page 494 of 59 S.Ct., 83 L.Ed. 627, 123 A.L.R. 599, the court said:

"* * * The discharge was clearly proved.

* * * * * *

"This conduct on the part of the employees manifestly gave good cause for their discharge unless the National Labor Relations Act [29 U.S.C.A. § 151 et seq.] abrogates the right of the employer to refuse to retain in his employ those who illegally take and hold possession of his property."

Again on page 256 of 306 U.S., on page 496 of 59 S.Ct., 83 L.Ed. 627, 123 A.L.R. 599: "* * * When the employees re-

sorted to that sort of compulsion they took a position outside the protection of the statute and accepted the risk of the termination of their employment * * *."

The quoted language indicates that the court recognized the unlawful conduct merely as grounds for a discharge. Again it might have afforded justification for a refusal of reinstatement, but again petitioner did not exercise any right it had in this respect. Sit-down strikers were reinstated on the same conditions as those who had not thus participated.

Petitioner having raised no question concerning the status of such employees either prior to, or at the time of the strike settlement, we conclude it could not do so afterwards. In this connection, it is also pertinent to observe that the record, with the exception of twelve or fourteen Board witnesses who admitted they participated in the sit-down strike, is silent as to who were the participants. In fact, it is shown with no certainty as to the number who participated. Petitioner's president estimated the number at 75, the Board found "about 100" and some of the witnesses placed the number as high as 150. It would seem that petitioner's rights in this respect, if any, would constitute matters of defense to the Board's charge, and that the burden was upon petitioner to offer proof in support thereof. Certainly all the employees should not be deprived of the benefits of the Act because certain undisclosed ones forfeited their rights. To sustain petitioner's contention would, in effect, produce such a result.

Another contention advanced by the petitioner is that the Board was without authority to require petitioner to offer reinstatement to the employees who were on strike on March 23, 1937, and thereafter, and who have not since been re-employed, placing those for whom employment is not immediately available, upon a preferential list. The provision in this respect requires only that the employees be made whole for any loss of pay suffered because of petitioner's refusal to re-employ them or place them upon a preferential list.

As we understand petitioner's contention, it is based largely upon two propositions: (1) that the employees who refused, at petitioner's request, to return to work on March 25, 1937, lost their status as employees, and (2) that the order of the Board in this respect includes individuals who were not named in the charge filed with the Board, or in the complaint issued thereon. In discussing the first reason, petitioner in its brief states: " * * * The determination of this question turns entirely upon the determination of the question of whether the company was guilty of an unfair labor practice in connection with the meetings held on March 23, April 9, April 17, June 21 and June 24, 1937. * * *".

Inasmuch as we have already determined this question adversely to petitioner, there is no occasion to further consider the first reason.

Petitioner's argument that the Board erroneously named in the order of reinstatement employees other than those mentioned in the complaint, is not tenable. In this respect, petitioner was charged and has been found guilty of a refusal to bargain collectively with the Union which caused its employees to continue the strike. The remedy provided for such violation is reinstatement and reimbursement for those affected by such unfair labor practice. In Republic Steel Corp. v. National Labor Relations Board, 3 Cir., 107 F.2d 472, a similar question was considered, and we agree with what the court said on page 478: "Republic further contends that the order for the reinstatement of the strikers was invalid because the complaint did not tender the issue of the reinstatement of the strikers. The complaint did, however, enumerate certain unfair labor practices and allege that because of these practices and of the refusal to sign the contract the strike took place. Section 10(c) of the Act specifically authorizes the Board to direct reinstatement of employees if unfair labor practices are found. Republic was, therefore, sufficiently informed that such action might be required by the Board."

Another contention with reference to the reinstatement order is that it includes 41 employees found to have been discriminated against. These employees, as we understand, were re-employed on various dates after the termination of the strike. Petitioner was found guilty of unfair labor practices in that, while re-employing them, it did not restore them to their former status, especially their seniority rights, and subsequently dismissed them because of their activity in behalf of the Union and, therefore, discriminated against them. The order provides for back pay from June 24, 1937, to the dates of their respective re-employment and from the dates on which they were found to have

been subsequently discharged until the date of their re-employment or placement upon a preferential list with restoration of seniority rights. It is again pointed out by petitioner that this provision of the order is beyond the issue presented by the complaint. We are of the opinion that this contention must also be denied. We see no reason why the Board may not take cognizance of an unfair labor practice occurring after the filing of a complaint of a nature similar to the charges specifically made. Otherwise, an employer guilty of the specific charges made could, by reinstating employees, circumvent the purpose of the Act. The reinstatement of the employees having been accomplished, the employer would then be free to discriminate against them even to the extent of discharging them, and nothing could be done about it until a new charge had been filed and another hearing had. This construction of the statute would be unreasonable and could serve no good purpose. Also, we are of the opinion that the order with respect to these 41 employees is supported by substantial evidence.

 The complaint in No. C-869 alleged that three named employees were discharged in violation of Section 8(3) of the Act. The Board's finding sustains the charge. Contentions are made (1) that there is no substantial proof in support of the Board's finding in this respect, and (2) that the Board was without jurisdiction for the reason that there was a variance between the charge and the finding. It appears that these employees were included in the 41 employees discussed heretofore. They were re-employed after the settlement of the strike, and laid off subsequent to the time of the hearing in Case No. C-577. It is the theory of the Board that they were laid off because of their unfavorable testimony to petitioner in the first hearing. There is much conflict in the testimony as to the reason for their discharge. It would serve no good purpose for us to attempt to analyze it. It is sufficient that we have read it and conclude that it furnishes the necessary support for the Board's finding. As to the jurisdictional question, it is argued that the complaint alleges a violation of Section 8(4) and that petitioner was found guilty of a violation of Section 8(3). Attention is called to Section 4(c), Article II of the Rules and Regulations of the Labor Board which require "a clear and concise statement of the facts constituting the alleged unfair labor prac-

tice. * * *" The complaint, with reference to the reason for the discharge, among other things, alleges: "* * * and for the further reason that they have been and continue to be members of the Union and engaged in concerted activities in that behalf."

While this particular language is alleged as a violation of Section 8(4), petitioner is also charged with a violation of Section 8(3). We do not agree with petitioner's contention that it was misled or prejudiced in the matter. The fact is, as petitioner must have known, that it was charged with discrimination in regard "to hire or tenure of employment."

 In connection with the Board's order that the various groups of employees be reinstated with back pay, there is the provision that the amounts received by such employees for work performed upon Federal, State, county, municipal or other work-relief projects, be deducted, and "paying over the amount so deducted to the appropriate fiscal agency of the Federal, State, county, municipal, or other government or governments which supplied the funds for said work-relief projects." It is the quoted provision of the order which petitioner contends the Board is without authority to require. The courts are divided as to the propriety of an order of this character. It was approved in Republic Steel Corp. v. Labor Board, 3 Cir., 107 F. 2d 472, 478. The court, without discussion, however, merely expresses the opinion that such an order is within the discretionary power of the Board, and calls attention to National Labor Relations Board v. Planters Mfg. Co., 4 Cir., 105 F.2d 750, where a similar order was approved, also without discussion.

In National Labor Relations Board v. Somerset Shoe Co., 1 Cir., 111 F.2d 681, decided May 9, 1940, the provision was approved without discussion and, apparently, without consideration. In Union Drawn Steel Co. v. Labor Board, 3 Cir., 109 F.2d 587, 594, we again find the provision approved by the same court which approved the order in Republic Steel Corp. v. Labor Board, supra.

On the other hand, we have a contrary holding in National Labor Relations Board v. Leviton Mfg. Co., Second Cir., 111 F. 2d 619, decided April 29, 1940, and National Labor Relations Board v. Tovrea Packing Co., 9 Cir., 111 F.2d 626, decided April 30, 1940. We are impressed with the

reasoning employed and conclusion reached in these cases that the Board is without power to decree such a requirement.

The Board inquires in its brief, in connection with this matter: " * * * Should the burden of relieving the distress of such employees be placed upon the public generally or upon the employer whose unlawful practices are responsible for their being out of work?"

This inquiry, in our opinion, is beside the question. Undoubtedly, the Board has the authority to order compensation for the employee who has sustained a loss by reason of an unfair labor practice on the part of the employer. We find nothing in the Act, however, which indicates an intention by Congress to confer upon the Board the power of guardianship over the treasurer of a governmental agency. As was pointed out in the Leviton case, supra, the theory of "work-relief" is not charity but compensation for work performed. The court said [111 F.2d 621]: " * * * We must assume that he gave as much as he got, and the order pro tanto transferred the burden of the public improvement from the public, which presumably is to profit by it, to the company which will do so only as a member of the public. * * *"

Although the suggestion is not made, we should think a serious question would be presented as to the right of a governmental agency to accept such funds in the absence of legislative authority so to do. Nor do we think the Board, as argued, is vested with discretionary authority in this respect, but even so, under the circumstances presented, the order would constitute an abuse of such discretion. No governmental agency, either before the Board or here, has requested that it be reimbursed for such payments. The order places upon petitioner an unreasonable requirement. How could it know or ascertain which, if any, of the numerous governmental agencies had furnished the employees with work-relief and the amount thereof? Although there is nothing indicative in the record, it is a matter of common knowledge that in some work-relief projects the funds are supplied by more than one, and sometimes numerous agencies. Under such circumstances, would it be the duty of petitioner to ascertain in what proportion the funds were furnished by these numerous agencies and reimburse them in the same proportion? Other questions of a similar nature suggest themselves, which we think

demonstrate that the provision is unreasonable and arbitrary as well. The Board's request for enforcement in this respect is denied.

■ The order requires petitioner to bargain collectively with the Union in respect to rates of pay and other conditions of employment and "if an understanding is reached on said matters, embody said understanding in a signed agreement." It will be noted that this requirement of the order is in conflict with the opinion of this court in Inland Steel Co. v. Labor Board, 7 Cir., 109 F.2d 9, and Fort Wayne Corrugated Paper Co. v. Labor Board, 7 Cir., 111 F.2d 869, decided March 28, 1940. Without further discussion of the question, we adhere to our holding in these cases. The language last above quoted will be deleted from the enforcement order.

■ In connection with the provision requiring the company to bargain with the Union, it is argued by petitioner that even though the Union was the proper bargaining agent on the various dates found in 1937, it has ceased to be such agent. Attention is called to the fact that on September 7, 1939, subsequent to the Board's order and decision, a petition for rehearing was filed in which it was specifically alleged that the Union had ceased to exist and that it no longer represented a majority of petitioner's employees. The petition contained an offer to prove these allegations if a rehearing was granted. The petition was denied by the Board.

It is not to be overlooked that the controversy concerning the Union as an appropriate bargaining agency occurred in 1937, now more than three years past. As pointed out heretofore, this and other courts have held that where a majority is shown, there is a presumption of its continuance in the absence of proof to the contrary, but we are of the opinion that such presumption continues for a reasonable time only. Certainly there is no presumption that it continues forever, and we think that it does not continue for as long as three years, especially in face of an assertion and offer of proof to the contrary. We should think that the Union itself would welcome an opportunity to demonstrate that it represents a majority of the employees and we see no reason why the Board should object. We are not unmindful of the familiar argument advanced by the Board that a fair election cannot be had until the last vestige of unfair labor

practice has been removed as required by the Board's order. In other words, so it is argued, the unfair acts on the part of the employer create in the employee a state of mind which prevents a free expression of opinion on his part. To us this argument is imaginary rather than real. In fact, the opposite effect, if any, would be the natural result. We accord to the ordinary employee, intelligence such as will enable him to know when he is being imposed upon by his employer, as well as the ability to properly protect his own interest in an election conducted by secret ballot, for the purpose of determining whom he desires as his bargaining agent.

It appears reasonable to us, in view of the circumstances, in order to properly safeguard the rights of the interested parties, that the Board conduct an election for the purpose of determining whether the Union in question now represents a majority, in the appropriate unit, of petitioner's employees. Our order in this respect will, therefore, be conditional upon such ascertainment. We think our authority to impose such a requirement is found in National Labor Relations Board v. Fansteel Corp., supra, 306 U.S. page 262, 59 S.Ct. page 498, 83 L.Ed. 627, 123 A.L.R. 599, and in National Labor Relations Board v. National Licorice Co., 60 S.Ct. 569, 84 L. Ed. 799, decided March 4, 1940, affirming 2 Cir., 104 F.2d 655.

The petition to review and set aside the order of the National Labor Relations Board is denied, and the petition of the Board for an order of enforcement is allowed, the order to be modified in conformity with the views expressed in this opinion.