**NATIONAL LABOR RELATIONS BOARD**
**v. WAUMBEC MILLS, Inc.**
No. 3528.

Circuit Court of Appeals, First Circuit.
Aug. 20, 1940.

Thomas E. Harris, Department of Justice, of Washington, D. C. (Charles Fahy, Robert B. Watts, Laurence A. Knapp, Mortimer B. Wolf, and Alvin Rockwell, all of Washington, D. C., on the brief), for petitioner.

John R. McLane, of Manchester, N. H. (McLane, Davis & Carleton, of Manchester, N. H., on the brief), for respondent.

Before MAGRUDER and MAHONEY, Circuit Judges, and PETERS, District Judge.

MAGRUDER, Circuit Judge.

On this petition by the National Labor Relations Board for enforcement of an order (49 Stat. 454, § 10(e), 29 U.S.C.A. § 160(e), the question presented is whether the Board can require an employer to offer employment, with back pay, to two applicants for employment who were turned away, but who, as the Board found, would have been hired but for their previous record of union activity.

Waumbec Mills, Inc., respondent, a New Hampshire corporation, was incorporated June 8, 1937. In July of that year it became engaged in the production, sale and distribution of rayon fabrics. Its plant is at Manchester, New Hampshire, one of the units of the former Amoskeag properties, which had been idle since 1935, following the general textile strike of 1934. The jurisdictional facts need not be stated since the company is without question subject to the National Labor Relations Act, 29 U.S.C.A. § 151 et seq. National Labor Relations Board v. Fainblatt, 306 U.S. 601, 59 S.Ct. 668, 83 L.Ed. 1014.

With the commencement of production, and for some time thereafter, respondent was in need of experienced rayon loom fixers. Prior to the opening of the Waumbec Mills, applications for employment were received at the U. S. Silk Mills, also situated in Manchester, by William Zopfi, the respondent's superintendent, who had full authority to hire employees. Due to the existing unemployment in the industry, applications for employment greatly exceeded the available jobs, but applicants who had worked with cotton looms only, rather than with rayon looms, were considered not to have had the requisite experience.

Among the first to apply were Alphonse Chartier and Edward G. Geoffrion, the two men alleged to have been victims of an unfair labor practice by respondent.

Chartier, who was forty-six years old at the time of the hearing, had lived in Manchester for many years. He had worked in textiles for almost thirty years and had been a loom fixer for much of that time. At the time he applied for work with the respondent, he had had two and one-half years' experience as a rayon loom fixer and was employed in that capacity in the Pacific Mills in Lawrence, Massachusetts; he was later laid off due to a curtailment in production.

He was active in the affairs of the Union, Local 86 of the United Textile Workers, being its treasurer from 1929 until 1933, its president for four or five months, from about November, 1934, until the spring of 1935, and chairman of the negotiating committee for loom fixers in 1934 and 1935. As such he was on the Textile Council of all textile labor organizations in the city of Manchester. He apparently took an active part in negotiations with employers before, during, and after the general textile strike in 1934. Due to lack of employment in the industry in the vicinity of Man-

chester, the Union was virtually inactive for some time. It is not clear whether Chartier actually resigned as president of the Union or whether he merely considered the office as defunct in view of the inactivity of the Union.

Geoffrion was fifty years old at the time of the hearing, and had always lived in Manchester. He had been in the textile industry for thirty-three years, twenty-five years of which were spent as a loom fixer. At the time of his application with the respondent he had had about twenty-one months of experience as a rayon loom fixer at the Pacific Mills in Lawrence, Massachusetts, and he continued thereafter in the same position. He was secretary and treasurer of the Union from 1934 until the organization became inactive. He never resigned. He was also for a time treasurer of the Loom Fixers Social Club, a separate social organization for loom fixers to which members of the Union automatically belonged, and for an undefined period he was a trustee of the Union.

One day during the last week in June or early in July, 1937, Chartier and Geoffrion went together to interview Zopfi at the U. S. Silk Mills and asked for employment as rayon loom fixers in the Waumbec plant. Though both applicants were then employed in the same craft capacity by the Pacific Mills in Lawrence, Massachusetts, about thirty miles distant from Manchester, they preferred to work in Manchester where their families and homes were, rather than to continue their practice of commuting to and from Lawrence.

At this first interview Zopfi questioned Chartier and Geoffrion as to their general experience, their work and pay at Lawrence, and the type of looms which they tended there. He took their applications on a piece of paper since regular card forms had not been prepared. Details of wages and employment agreeable to all were discussed. Zopfi then raised the question of union affiliation. The two applicants told him that they had previously been officers of the Union but were no longer. According to Chartier, Zopfi said that he was glad they had told him this and that "We don't want any trouble; we don't want no union and we don't want no trouble."

Zopfi then invited the two men to accompany him to the Waumbec plant where they were introduced to the overseer Prokuski. Chartier and Geoffrion were shown the looms of which they would be in charge if they were employed, and again their experience on rayon looms at the Pacific Mills in Lawrence was discussed. Neither Zopfi nor Prokuski expressed doubt as to their experience or ability to take charge of the looms. Chartier testified: "Mr. Zopfi thought we had enough experience, and we felt we were hired then". Zopfi assured them that they would hear from him within a few days, after an "investigation".

No word reaching them, the two men again visited the respondent's plant on or shortly before July 15, 1937. As to this visit, Chartier testified:

"Q. You saw Mr. Zopfi with some people? A. Yes. He came over to us and he said, 'No use, boys; we don't want any trouble; you are the president of the Union', and he said to Geoffrion, 'You are the secretary. We won't want any trouble here'. I says, 'Who told you that I was the president of the Union?' Then of course he wouldn't tell me.

"I told him, 'Whoever told you that, it would be good for him to tell you the truth, that I am not'. I told him before that I had been but I resigned from the Union.

"Well, he said, 'Don't go away like that. I am new in the city. I don't know all the people. Later on we might come to terms.'"

Geoffrion testified to the same effect.

In mid-August Chartier returned alone. His account of this visit is as follows:

"Well, I met Mr. Zopfi and he told me that he found that I have made a lot of trouble in the Amoskeag and he also had found I was a very good loom fixer. He says, 'They tell me that you made some trouble in the Amoskeag; you told the Amoskeag who to hire and who to fire in the loom fixers. We don't want any trouble here. I am not ready to hire anybody that is making trouble.'"

Chartier made three or four subsequent applications but each time was refused employment either by Zopfi or Prokuski.

After the interview on or about July 15, 1937, Geoffrion did not visit the Waumbec Mills until February, 1938. During the latter month he learned from Maurice Huard, a weaver employed by the respondent, that the company was "badly in need of loom fixers with experience on rayon".

Huard, who had worked with Geoffrion in Lawrence, urged him to apply. Geoffrion replied that his application had been on file for some months. A few days later Huard reported to Geoffrion, according to the testimony of both, that the "boss" at respondent's plant wished to see him. Geoffrion went to the plant and saw Prokuski who, he testified, asked him, "Aren't you the fellow who was here with Chartier before?" Prokuski admitted that he needed three or four good loom fixers at the time and promised to speak to the "other fellow", apparently referring to Zopfi. He asked Geoffrion if he then held any office in the Union. Geoffrion admitted that he was treasurer of the Loom Fixers Social Club. He received no further word from the management.

None of the above-recited testimony concerning the conversations and events at the various interviews between the two applicants and the respondent's advisory officials was contradicted by any evidence adduced by respondent at the hearing before the Board. Zopfi testified at length. Prokuski was not called.

In its answer to the Board's complaint, respondent stated "that the most that can be said on behalf of applicants Chartier and Geoffrion is that in competition with other applicants their record of activity and labor union organization was given consideration". What part this consideration played was a question of fact for the Board. The testimony of Zopfi, though vague and contradictory in places, contained admissions which the Board might legitimately regard as significant.[1] Zopfi sought to draw a distinction between "good" labor union records and "undesirable" labor union records. This dis-

[1] The following are extracts from the testimony of Zopfi:

"X-Q. 252. Their labor union record was part of the thing that made you decide to hire other people besides Chartier and Geoffrion? A. Yes.

"X-Q. 253. What was there about their labor union record that you didn't like? A. I didn't just know. I know from their record that they were not very desirable.

"X-Q. 254. What is that again? A. They were not very desirable.

"X-Q. 255. You just knew that they were not very desirable? A. Yes.

"X-Q. 256. That is the part of their labor union record you didn't like, is it? A. Yes.

"X-Q. 257. They were not desirable because of their labor union record? A. That didn't make the whole decision in the matter.

"X-Q. 258. But that was part of it? A. That was a small part of it.

"X-Q. 259. Why did you consider that? A. Because I have some other more desirable people standing in line with them. I knew they were union men but they had good records.

"X-Q. 260. Why did you consider the labor union record of Chartier and Geoffrion in trying to make up your mind whether to hire them? A. I haven't made up my mind yet on that, but I had more desirable people in line waiting for the jobs.

"X-Q. 261. I want to know why you took into consideration their labor union record in trying to make up your mind whether to hire them. A. Because I was told they were not so desirable."

"Mr. McLane [respondent's counsel].

There is such a thing as a bad labor union record.

"Mr. Schneider [Board's counsel]. If that is the thing that influenced this man, why doesn't he tell us?

"Mr. McLane. He stated that it was not a particularly good record. That is about the same thing as saying it was an unfavorable record.

"X-Q. 267. Has Mr. McLane stated it properly? A. Yes.

"X-Q. 268. Then it was the bad union record that influenced you? A. It was a part of the decision."

"X-Q. 337. As a matter of fact, when you were in the Labor Board office in Boston, you said that the reason you didn't hire him was because of his labor union record? A. By record I mean that this covers a wide field.

"X-Q. 338. Using it in the broad sense then, it is true? A. It is true what, please?

"[The question was read as above recorded.]

"A. Using it in the sense that I haven't seen any written record anywhere.

"X-Q. 339. It is true that when you were in the Labor Board's office in Boston you said the reason you didn't hire Mr. Chartier and Mr. Geoffrion was because of their union records? A. I don't know how far I went.

"X-Q. 340. You may have used those words? A. No; I don't remember how far I went on this.

"X-Q. 341. You mean you may have said it? A. I may have said it.

"X-Q. 342. If you said it, it was true? A. Said what was true?

"X-Q. 343. Anything you said in the Labor Board office was true? A. Yes.

tinction is expressed by respondent in its brief before us as follows:

"Respondent insists that there is a real difference between (1) the refusal to hire a man on account of his affiliation with the union and engaging actively in union affairs, and (2) refusal to hire a man because of an honest belief that his record and reputation as a union officer is unsatisfactory. To put it another way there is a difference between union affiliation and union record. It may be conceded that the record discloses evidence sufficient for a finding to support the refusal in (2) hereinabove but it falls short of (1) hereinabove."

Zopfi claimed that he had learned upon investigation that Chartier and Geoffrion were not "very desirable" on account of their labor union record. He said he could not remember a single person from whom he had elicited this information but asserted that he had not obtained it from anybody for whom the applicants had worked or from anybody with whom they had worked. Zopfi refused to state what there was specifically "undesirable" about the labor union records. No evidence was introduced by respondent to indicate that the activities of Chartier and Geoffrion had been other than the normal and legitimate activities of union officials. Since Zopfi stated that he never made inquiry about Geoffrion's record, what there was "undesirable" about it must have been comprehended in the information which Geoffrion gave to Zopfi at the time of his original application, namely, that he had been an official of the loom fixers' union. On this aspect of the case the Board in its decision states:

"There is nothing in the entire record to indicate that either Chartier or Geoffrion had ever committed or had ever been accused of committing any unlawful acts within or without their capacities as union officials. In view of the respondent's failure otherwise to define or clarify the terms, 'undesirable labor union record', and 'trouble·maker', and in view of the circumstances under which they were used, we find that the respondent considered them as applicable solely to the previous lawful union activities of the two men. That normal union activities would be regarded by the respondent as 'undesirable' is amply established by Zopfi's announcement that 'we don't want no union', and by·the record as a whole."

The respondent advanced as a ground .for its refusal to employ Chartier and Geoffrion that they lacked experience on the type of looms installed in the Waumbec plant. Yet no such objection was made to them at the time of their first interview with the superintendent and overseer when they were questioned as to their general experience, and when they were taken through the mill and shown the type of looms to be used. Furthermore, the greater part of the looms installed in the mill were of the same general type, though newer, and required the same type of skill to operate, as those in use at the Pacific Mills where the two applicants had been employed. Respondent gave employment to four men who had obtained their experience on rayon at the Pacific Mills. One of these, Goddette, a loom fixer with less experience on rayon looms than either Chartier or Geoffrion, was employed by respondent on July 19, 1937, apparently without any inquiry into his qualifications beyond what was elicited from him when he applied. Consequently there was substantial evidence from which the Board could infer that the men's alleged lack of experience was not a factor in the respondent's refusal to take them on.

The suggestion was also made that the ages of Chartier and Geoffrion, forty-six and fifty respectively, constituted an adverse factor. As to this the Board states in its decision:

"Records introduced at the hearing show that of the 16 loom fixers employed by the respondent at that time, 6 of them range from 41 to 56 years of age. This would indicate that the ages of Chartier and Geoffrion, as well as of other applicants as old or older, were not of themselves a decisive factor in determining eligibility for employment. Even more significant on this point is Zopfi's admission that at the time he made inquiries concerning Chartier's record he had forgotten the applicant's age and lost the memorandum showing it. He had made no subsequent efforts to ascertain Chartier's age though he declared as late as the hearing that he was still considering his application."

The crucial finding of fact by the Board is as follows:

"All of the evidence leads to the conclusion that the decisive factor in the respondent's refusal to hire Chartier and Geoffrion

was the fact that they had previously been union leaders and had taken an outstanding part in concerted activities for mutual aid and protection with employees of textile mills in Manchester, New Hampshire. We find that Alphonse Chartier and Edward G. Geoffrion would have been employed by the respondent on or before July 15, 1937, but for the respondent's knowledge of their past union leadership."

The Supreme Court has had occasion recently to emphasize the very limited function entrusted to the courts in reviewing findings of fact by the National Labor Relations Board. National Labor Relations Board v. Waterman Steamship Corp., 1940, 309 U.S. 206, 208, 209, 226, 60 S.Ct. 493, 84 L.Ed. 704; National Labor Relations Board v. Bradford Dyeing Ass'n, 1940, 60 S.Ct. 918, 930, 931. Mindful of this limitation and after an attentive examination of the whole record, we are satisfied that the foregoing finding by the Board, coinciding

with that of the trial examiner, was a rational inference from the evidence and therefore must be accepted by us on review.

On the basis of these findings of fact the Board concluded that respondent had been guilty of unfair labor practices within the meaning of Section 8(3) and (1) of the Act. The order of the Board, dated September 1, 1939, is reproduced in the footnote. [2]

We are thus brought to a consideration of the question whether a discriminatory refusal to hire is an unfair labor practice within the meaning of Section 8 of the National Labor Relations Act. This question has been answered in the negative by the Second Circuit in National Labor Relations Board v. National Casket Co., 2 Cir., 107 F.2d 992, and in Phelps Dodge Corp. v. National Labor Relations Board, 2 Cir., 113 F.2d 202, 206, decided July 11, 1940. In the latter case Judge Learned Hand filed a concurring memorandum, [3] stating

[2] "Upon the basis of the above findings of fact and conclusions of law and pursuant to Section 10(c) of the National Labor Relations Act, the National Labor Relations Board hereby orders that the respondent, Waumbec Mills, Inc., Manchester, New Hampshire, and its officers, agents, successors, and assigns shall:

"1. Cease and desist from:

"(a) Discouraging membership in United Textile Workers of America, Local 86, or any other labor organization of its employees, by discriminating in regard to the hiring of applicants for employment;

"(b) In any other manner interfering with, restraining or coercing its employees in their rights to self-organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purposes of collective bargaining and other mutual aid or protection as guaranteed in Section 7 of the National Labor Relations Act.

"2. Take the following affirmative action which the Board finds will effectuate the policies of the Act:

"(a) Offer immediate employment to Alphonse Chartier and Edward G. Geoffrion at the same or substantially equivalent positions at which they would have been employed on July 15, 1937, had the respondent not unlawfully refused to hire them;

"(b) Make whole Alphonse - Chartier and Edward G. Geoffrion for any loss of pay each may have suffered as the result of the respondent's refusal to hire him from July 15, 1937, to the date employ-

ment is offered him, less his net earnings during that period, deducting, however, from the amount otherwise due to each of them monies received by him during that period for work performed upon Federal, State, county, or municipal or other work-relief projects, and pay over the amount so deducted to the appropriate fiscal agency of the Federal, State, county, municipal, or other government or governments which supplied the funds for said work-relief projects;

"(c) Immediately post notices in conspicuous places in its plant, buildings, and other places of employment, and maintain them for a period of at least sixty (60) consecutive days, stating that it will cease and desist in the manner set forth in 1 (a) and (b), and that it will take the affirmative action set forth in 2(a) and (b) of this Order; and

"(d) Notify the Regional Director for the First Region in writing within ten (10) days from the date of this Order what steps the respondent has taken to comply herewith."

[3] "I agree that the men who were on strike on July 5, 1935, were entitled to reinstatement, though not because the dispute which caused them to quit their jobs, was 'current' when the act took effect. If I were free to decide, I should hold that it was an 'unfair labor practice' to discriminate against anyone, whether an 'employee', or not. Section eight has five subdivisions and two of them —two and three—do not use the word. Moreover, not only does the text for that reason not require that these subdivisions shall be limited to employees, but the pre-

that if he were not bound by the previous decision in the National Casket case, he would hold it an unfair labor practice to discriminate against anyone, whether an employee or not. The point is open in this circuit. We believe the view expressed by Judge Hand is correct in the light of the background of the Act, its legislative history, its declaration of policy, and indeed its very terms. Accordingly we are constrained not to follow the precedents in the Second Circuit.

■ It is the declared purpose of the National Labor Relations Act to promote the free flow of interstate commerce by removing certain recognized sources of industrial strife and unrest, "by encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection". § 1, 49 Stat. 449, 29 U.S.C.A. § 151. A long experience had shown that one of the most provocative and effective means by which employers sought to impede the organization of workers was the blacklisting of union men, thereby denying them opportunities for

employment. See Final Report of the Industrial Commission (Government Printing Office: H. Doc. No. 380, 57th Cong., 1st Sess., 1902), Vol. XIX, pages 892–893, 952; Encyclopaedia of the Social Sciences (1935) Vol. II, pages 578–579; Commons and Associates, History of Labour in the United States (1926) Vol. 1, pages 362–363, 420–422; Sub-comm. of the Senate Comm. of Education and Labor, Preliminary Report, Sen. Rep. No. 46, 75th Cong., 1st Sess., 1937, page 8; Daugherty, Labor Problems in American Industry (1933) pages 389–390; Patterson, Social Aspects of Industry (2d ed. 1935) pages 402–403; Cummins, The Labor Problem in the United States (2d ed. 1935) page 351. The states passed laws against blacklisting, but these enactments failed of their purpose largely because individual employers, under Adair v. United States, 208 U.S. 161, 28 S.Ct. 277, 52 L.Ed. 436, 13 Ann.Cas. 764, were free to discharge or refuse to employ members of the union.[4]

In Section 7 (a) of the National Industrial Recovery Act, 48 Stat. 198, Congress required that every code of fair competition contain the following conditions: "(1) That employees shall have the right to organize and bargain collectively through representatives of their own

dominant purpose of the act as a whole requires an opposite construction. One can as effectively interfere with the rights which § 7 secures by refusing to hire as by discharging; that is, unless we interpret 'employees' in § 7, as limited to persons actually employed at the moment, which would certainly mutilate the act. Nor am I moved by the argument that the employer must be free to hire whom he will. The whole purpose is to limit his liberty so far as its exercise may invade the new rights created; and I can see no greater limitation in denying him the power to discriminate in hiring, than in discharging. Except for National Labor Relations Board v. National Casket Company, 2 Cir., 107 F.2d 992, I should therefore have sustained the order, not only as to those on strike when the 'unfair labor practice' occurred, but as to the two who were not on any theory 'employees' at that time. But, having taken part in that decision and my notions being then overruled, I regard it as authoritative. It is another question whether anyone who is not an 'employee', is entitled to reinstatement, but that I pass, because it does not arise if it was not an 'unfair labor practice' to discriminate against the two men in question."

[4] See Commons and Andrews, Principles of Labor Legislation (1927) 123–24:
"Most of the states of the union have laws prohibiting blacklisting; but they have been dead letters. The explanation lies in the fact that employers may discharge or refuse to employ any workman who is an 'agitator' or who belongs to a union. * * * He who circulates this information may be punished; but the employer who acts upon it is entirely within his rights. * * * Moreover, the supplying of such information by a former employer upon the request of the present employer is regarded as privileged. It is expressly declared legal in the anti-blacklist laws of many states. * * * If the information was supplied by an employers' association or furnished gratuitously by the former employer, the blacklisted workman cannot recover unless he proves who furnished the information and that he was discharged as a result thereof. He cannot establish either proposition unless the employer who discharged him is in sympathy with him. This is not the case where the reason for the discharge was membership in a labor union."

choosing, and shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection; (2) that no employee and no one seeking employment shall be required as a condition of employment to join any company union or to refrain from joining, organizing, or assisting a labor organization of his own choosing; * * *." The report of the House Committee in recommending passage of the National Labor Relations Act referred to it as "merely an amplification and further clarification of the principles enacted in the law by the Railway Labor Act [45 U.S.C.A. § 151 et seq.] and by Section 7 (a) of the National Industrial Recovery Act, with the addition of enforcement machinery of familiar pattern." H. Rep. No. 1147, 74th Cong., 1st Sess., 1935, page 3.

Congress provided in the National Labor Relations Act as follows:

"Sec. 7 [§ 157]. Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection."

"Sec. 8 [§ 158]. It shall be an unfair labor practice for an employer—

"(1) To interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 [157 of this title].

\* \* \* \* \* \*

"(3) By discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization * * *."

Respondent contends that "Section 8 (1) and (3), properly interpreted, does not cover the conduct of the employer until a contract of hire is made and consummated." With this we cannot agree.

 The refusal to employ an applicant because he has been an active union official must certainly be regarded as a "discrimination in regard to hire" within

the natural meaning of those words, a meaning which coincides so faithfully with the declared policy of the Act that there can be no justification to reach for a strained construction. An offer of employment only on condition that the applicant will not join a union or will refrain from union activity, is without doubt a violation of Section 8 (3) as a "discrimination in regard to * * * any term or condition of employment." [5] It would be a most extraordinary result if the Act prohibits this milder conduct by an employer and yet permits him to deny employment unconditionally because of an applicant's former union activity. If employers are free to pursue a policy of blacklisting applicants with labor union records, then the other prohibitions of the Act are of little worth. Such a manifestation of anti-union bias on the part of an employer necessarily casts a coercive shadow upon his employees, tending to inhibit the free exercise of their right of self-organization and to deprive the employees of potential leaders. Furthermore, the exercise by employees of their right to self-organization would inevitably be restrained by the contemplation that if for any reason they should lose their present jobs they might freely be discriminated against, in seeking other employment, because of their record of union activity.

Our reading of the language of the Act in its natural meaning is consistent with its legislative history. The report of the House Committee on Labor (H. Rep. No. 1147, 74th Cong., 1st Sess., p. 19) in referring to Section 8 (3) states:

"The third unfair labor practice prohibits an employer by discrimination in regard to hire or tenure of employment or any term or condition of employment, to encourage or discourage membership in any labor organization. This spells out in greater detail the provisions of section 7 (a) prohibiting 'yellow-dog' contracts and interference with self-organization. This interference may be present in a variety of situations in this connection, such as discrimination in discharge, lay-off, demotion or transfer, hire, forced resignation, or division of work; in reinstatement or hire following a technical change in corporate structure, a strike, lock-out, temporary lay-off, or a transfer of the plant. [Italics ours.]"

---

[5] This is apparently conceded even by the majority opinion in the National Casket case, supra, 107 F.2d at page 997.

It may be noted that in referring to the familiar situation of a corporate reorganization and the taking over of a business by a newly formed corporation, the Committee indicated that discrimination by the new corporation in taking over the old employees would be a violation of Section 8 (3), whether regarded as a reinstatement or a new hiring. The chairman of the Senate Committee on Labor, in explaining the proviso in Section 8 (3) permitting discrimination in pursuance of a closed shop agreement with a union representing a majority of the employees, had this to say (79 Cong.Rec. 7674, 1935):

"All this bill says is that *no employer may discriminate in hiring a man, whether he belongs to a union or not, and without regard to what union he belongs;* but if an employer wishes to agree and to make a contract of his own volition with his employees to hire only members of a company union or of a trade union, he can do so. [Italics ours.]"

We conclude that the discriminatory refusal to hire in the case at bar was an unfair labor practice under the specific provisions of Section 8 (3); and being such, it was also an unfair labor practice under the more general provisions of Section 8 (1).

■ This emphatically does not mean that an employer may not lawfully decline to employ a union applicant, any more than does the prohibition against a discriminatory discharge forbid an employer ever to discharge a union man. In either case, the statutory test is whether the applicant was rejected or the employee discharged on account of union membership or activity, or on account of some permissible criterion. The function entrusted to the Board, of delving into motive, is no doubt a delicate one, but no more so in the one case than in the other.

Next to be considered is the appropriate remedy for the unfair labor practice. Section 10 (c) of the Act provides that the Board shall issue "an order requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action, including reinstatement of employees with or without back pay, as will effectuate the policies of this Act [chapter]."

The cease and desist portion of the Board's order is mandatory. National Labor Relations Board v. Pennsylvania Grey-hound Lines, Inc., 303 U.S. 261, 265, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307. But if this is all the Board may do in respect to the type of unfair labor practice here involved, employers can with impunity make a mockery of the Act and of the Board's processes. Take the case of an employer who opens a new plant. He inaugurates the unlawful policy of hiring only non-union men. The jurisdiction of the Board is invoked by the filing of a charge of unfair labor practices. After the lapse of weeks, or even months, the Board issues an order directing the employer to cease and desist from discrimination in hiring. But the Act carries no penalty for the violation of a mere order of the Board to cease and desist; so the employer without risk can continue his practice of discrimination while litigation is pending in the courts for enforcement or review of the Board's order. Finally, the court issues a decree that the employer cease and desist from discrimination in hiring. But by this time the employer has a full complement of workers. The stable door is locked after all the horses have been stolen. A cease and desist order, alone, is therefore hardly adequate to deal with the situation.

■ Section 10 (c) also authorizes the Board to devise appropriate affirmative relief which may be deemed necessary to effectuate the policies of the Act. Within broad limits, it is for the Board, not for the courts, to draw the inference from the underlying facts as to what measures of affirmative relief are necessary to undo the effects of an unfair labor practice and to effectuate the policies of the Act. National Labor Relations Board v. Pennsylvania Greyhound Lines, Inc., 303 U.S. 261, 265, 270, 271, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307; National Labor Relations Board v. Falk Corp., 308 U.S. 453, 461, 60 S.Ct. 307, 84 L.Ed. 396; cf. National Labor Relations Board v. Fansteel Corp., 306 U.S. 240, 257, 258, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599.

In the case of a discriminatory discharge, even if Congress had omitted from Section 10 (c) the phrase "including reinstatement of employees with or without back pay" there can be no doubt that an order of reinstatement with back pay would have been held "such affirmative action * * as will effectuate the policies of this Act [chapter]". Texas & N. O. R. Co. v. Brotherhood of Railway & Steamship Clerks,

5 Cir., 33 F.2d 13, affirmed, 281 U.S. 548, 50 S.Ct. 427, 74 L.Ed. 1034. Such a restoration of the situation as it would have been had the unfair labor practice not occurred is obviously needed to wipe out the coercive effect of the employer's conduct. No less appropriate, it would seem, is a corresponding order, in the case of a discriminatory refusal to hire, requiring the employer to offer employment with back pay, to the applicant who would have been given a job had it not been for the unfair labor practice. Nothing short of this would be efficacious at all. On principle, the same question might arise in contempt proceedings: The circuit court of appeals in enforcing a Board order decrees that an employer shall cease and desist from discrimination in hiring.' A vacancy occurs. The employer is about to employ a well qualified applicant when he learns that he is a union man. Thereupon, and for that reason, he' turns him away. The court decree has been flouted; what ought the court to do about it? One recourse may be punishment for criminal contempt. So far as civil contempt is concerned, how could the court compel the employer to purge himself of contempt? Would it merely order him again to cease and desist? Probably more than this; the court might well order the employer to bring about the situation which would have existed had the decree not been violated, that is, to offer employment to the rejected applicant. If this would be an appropriate remedy for the violation of a court decree forbidding discrimination in hiring, is it not equally an appropriate remedy to be prescribed by the Board for a discriminatory refusal to hire in violation of Section 8 (3) of the Act?

■■ But it is earnestly contended that the power to order this affirmative measure of redress for a discriminatory refusal to hire has been denied to the Board by a negative implication derived from the phrase in Section 10 (c) "including reinstatement of employees with or without back pay". This restrictive interpretation is not supported by the context or the legislative history of the Act. , It seems to us that the phrase was more probably inserted out of abundant caution to illustrate a type of relief appropriate to the commonly recurring unfair labor practice of discriminatory discharge, rather than put in for the purpose of limiting the remedial powers of the Board. The interpretation we now

adopt was suggested to the Supreme Court in National Labor Relations Board v. Fansteel Corp., 306 U.S. 240, 59 S.Ct. 490, 83 L. Ed. 627, 123 A.L.R. 599, and seems to have been accepted by the court. At pages 257, 258 of the opinion in 306 U.S., 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599, the court indicates, as we read it, that the only restriction upon the Board's power to prescribe affirmative relief is the general one that the order must effectuate the policies of the Act. In the absence of more explicit language in the Act, we should be loath to construe Section 8(3) as excluding a type of affirmative redress, in case of a discriminatory refusal to hire, which otherwise might reasonably be regarded by the Board as necessary and appropriate for effectuating the policies of the Act, and the lack of which would afford so facile a means of thwarting its purposes.

■ Finally, respondent argues that the Act, as we have construed it, is unconstitutional under the Fifth Amendment, citing Adair v. United States, 208 U.S. 161, 28 S. Ct. 277, 52 L.Ed. 436, 13 Ann.Cas. 764; Coppage v. Kansas, 236 U.S. 1, 35 S.Ct. 240, 59 L.Ed. 441, L.R.A.1915C, 960. It is late in the day to cite those cases as invalidating legislation of this character. Texas & N. O. R. Co. v. Brotherhood of Railway & Steamship Clerks, 281 U.S. 548, 570, 571, 50 S.Ct. 427, 74 L.Ed. 1034; Virginian Ry. Co'. v. System Federation No. 40, 300 U.S. 515, 559, 57 S.Ct. 592, 81 L.Ed. 789; National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 45, 57 S. Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352.

It is suggested that Congress in the exercise of its power to regulate commerce may constitutionally annex an incident to an employment relationship already voluntarily entered into, and hence may forbid an employer to discharge an employee for union activity; but that it would be a deprivation of the liberty guaranteed by the Fifth Amendment for Congress to require an employer to enter into an employment relation where none existed before. This is a doctrinaire distinction which certainly cannot be found in the general wording of the Fifth Amendment. In either case the employer is being compelled to give employment to a man he does not want. Broadly, the "liberty" of the employer which is being restricted by the legislation is the liberty to run his business as he sees fit; with such employees as he sees fit. In the Adair case the majority of the court

thought that this liberty was an absolute one, not subject to the regulatory power of Congress. The court thought that it was "not within the functions of government—at least, in the absence of contract between the parties—to compel any person, in the course of his business and against his will, *to accept or retain* the personal services of another, or to compel any person, against his will, to perform personal services for another. [Italics ours.]" (208 U.S. at page 174, 28 S.Ct. at page 280, 52 L.Ed. 436, 13 Ann.Cas. 764.) Ordering an employer to reinstate a discharged employee was thus put on the same footing as ordering the employer to take on an applicant discriminated against. The court in National Labor Relations Board v. Jones & Laughlin Steel Corp., supra, in commenting on the Adair and Coppage cases, recognizes no constitutional distinction between these two situations. It said (301 U.S. page 45, 57 S.Ct. page 628, 81 L.Ed. 893, 108 A.L.R. 1352) that the National Labor Relations Act "does not interfere with the normal exercise of the right of the employer to select its employees or to discharge them". This normal right of selection or discharge may still be exercised for any reason deemed sufficient by the employer, except for the restriction that it may not be exercised for the purpose of interfering with the self-organization of employees. This is a restriction imposed by Congress in aid of, and appropriate to the accomplishment of, a valid national policy set forth in Section 1 of the Act.[6]

The supposed embarrassment to the employer in the administrative application of this restriction on his right to hire and fire was considered by the court, in the Jones & Laughlin case, supra, as follows (301 U. S. p. 46, 57 S.Ct. page 628, 81 L.Ed. 893, 108 A.L.R. 1352):

"It would seem that when employers freely recognize the right of their employees to their own organizations and their unrestricted right of representation there will be much less occasion for controversy in respect to the free and appropriate exercise of the right of selection and discharge."

What we have said is limited to the situation presented by the case at bar wherein the Board has found that the discrimination in hiring resulted in denying employment to applicants who would have been employed had the employer not applied a forbidden criterion. There may be cases where an applicant has been excluded from consideration out of hand because of prior union activity, but where it could not be found that the applicant would have been employed, in competition with other applicants, even had the employer not applied the forbidden criterion. In such a case the employer's conduct may well amount to an unfair labor practice, but we have no present occasion to consider what would be the appropriate remedy.

In one particular we believe the Board's order is without statutory warrant. In paragraph 2 (b) of the order the employer is directed to reimburse Chartier and Geoffrion for any loss of pay resulting from the unfair labor practice less his net earnings elsewhere, "deducting, however, from the amount otherwise due to each of them monies received by him during that period for work performed upon Federal, State, county, or municipal or other work-relief projects, and pay over the amount so deducted to the appropriate fiscal agency of the Federal, State, county, municipal, or other government or governments which supplied the funds for said work-relief projects." For the reasons stated in National Labor Relations Board v. Leviton Mfg. Co., 2 Cir., 111 F.2d 619, this quoted portion of paragraph 2 (b) of the order cannot be enforced, and will be omitted from our decree. Accord, National Labor Relations Board v. Tovrea Packing Co., 9 Cir., 111 F.2d 626; Stewart Die Casting Corp. v. National Labor Relations Board, 7 Cir., 114 F.2d 849, decided July 3, 1940. We did not discuss this point in our recent decision in National Labor Relations Board v. Somerset Shoe Co., 1 Cir., 111 F.2d 681, because the back pay portion of the order as a whole was not enforced by us, for the reasons stated in the opinion.

A decree will be entered enforcing the order of the Board with the modification of paragraph 2 (b) as previously indicated.

PETERS, District Judge (dissenting).

I dissent from the opinion and conclusion of the court without regard to the modification of the order of the Board referred to in the opinion.

---

[6] See the argument by Judge Hand, footnote 3, supra.